STATE OF NORTH CAROLINA v. PAUL SHEPHERD

No. 3

(Filed 7 October 1975)

1. Criminal Law § 5; Homicide §§ 7, 28— insanity — effect on premeditation and deliberation — jury instructions

The trial court in a first degree murder case did not err in failing to instruct the jury as to the effect of insanity or mental weakness on premeditation and deliberation.

2. Homicide § 21— first degree murder — insanity and premeditation and deliberation — sufficiency of evidence

The trial court properly denied defendant's motion for nonsuit as to first degree murder based primarily on defendant's claim that he was insane at the time of the killing and that the State failed to prove that the killing was with premeditation and deliberation where the evidence tended to show that defendant did know right from wrong at the time of the crime and did know that he had killed his wife, defendant was remorseful and tried to justify what he had done by the explanation that his wife was running around with one or more men, there was no evidence to indicate provocation on the part of deceased, and defendant used grossly excessive force by apparently firing the entire load of fourteen cartridges from a semi-automatic rifle, with four of the bullets striking deceased in the back.

3. Criminal Law § 112— reasonable doubt — jury instruction proper

The trial court's instruction to the jury that reasonable doubt was "not a doubt suggested by the ingenuity of counsel or your own ingenuity not legitimately warranted by the testimony" was correct and proper, though the trial court was not required to define "reasonable doubt" absent a request to do so.

4. Criminal Law § 101— dismissal of jury overnight — admonitions proper

The trial court's instruction to the jury, before letting them go to their homes for the night, to refrain from discussing the case with anyone and to receive no information concerning the case from TV, radio, newspaper or individuals was fair and without error.

5. Criminal Law § 101— jury — break between charge and deliberations — no error

The trial court did not err in telling the jury to take a ten minute break after the charge before going to the jury room, since the court had every reason to believe that the deliberations of the jury could be long and tedious.

6. Criminal Law § 132— motion to set aside verdict as contrary to weight of evidence — discretionary matter

Defendant's motion to set aside the verdict as contrary to the weight of the evidence was addressed to the trial court's discretion and the court's decision is not reviewable on appeal.

APPEAL by defendant from *Friday, J.,* at the 3 June 1974 Session of the Superior Court of BUNCOMBE County. (Petition for writ of certiorari allowed 27 January 1975.)

Defendant was convicted of first-degree murder of his wife. The judgment of the court was that the defendant be confined in Central Prison for the rest of his natural life and that he be given credit for the seven years, eight months, and twenty-one days of incarceration pending trial.

The State's evidence tended to show that on 14 September 1966 the defendant shot and killed his wife on a highway in Buncombe County and then shot himself. He used a semi-automatic .22 caliber rifle. There were at least four entrance wounds in the back of the deceased. The rifle held fourteen cartridges and fourteen spent cartridges were found at the scene. Witnesses testified that the defendant stated that he shot his wife and that he was crying. He told some witnesses that he was going to die and wanted to see his mother. He later told substantially the same thing to an Asheville police detective at the hospital. The defendant told some of the witnesses that he shot his wife because she was running around with other men.

A true bill of indictment was returned by the Buncombe County Grand Jury at the October 1966 term. On 19 December 1966 the defendant was committed to Dorothea Dix Hospital, Raleigh, N. C., pursuant to the provisions of G.S. 122-91 to determine his competency to stand trial. He remained there until 5 October 1971 when he was discharged. This discharge provided that the defendant "now understands the true nature and possible consequences of his criminal charge, and he is able to assist in his defense. This patient should be returned to court inasmuch as he is competent to stand trial." Thereupon the defendant was returned to Buncombe County and on 13 December 1971 he was readmitted to Dorothea Dix Hospital. He remained there until 26 March 1974 when it was recommended that he be returned to the Superior Court of Buncombe County, but that he should remain in the hospital until shortly before his trial. It was determined at this time that the defendant "has the capacity to comprehend his legal position and understand the nature and object of the proceedings against him. He is able to conduct his defense in a rational manner, and to cooperate with his attorney to the end that any available defense may be presented."

The defense offered the evidence of Dr. Robert Rollins, who was identified as the Director of the Forensic Unit of Dorothea Dix Hospital. Dr. Rollins expressed the opinion that the defendant could not distinguish right from wrong at the time he shot his wife. It developed on cross-examination that Dr. Rollins did not see the defendant until 1 October 1971, more than five years after the killing. He had to rely substantially on his examination at that time, plus the records made by others in the hospital. No one at the hospital had seen the defendant prior to the time of the killing. Without objection, the discharge records of Dorothea Dix Hospital were permitted into evidence. These indicated that the defendant was originally under the care of Dr. Laczko who died in July of 1971. Dr. Rollins succeeded him as Director of the Forensic Unit. Dr. Rollins indicated that the fact that defendant killed his wife "could have contributed to the depressive state Dr. Laczko found him in." Even though Dr. Rollins determined that the defendant was depressed at the time of the crime, it was his opinion that the fact of the crime "probably would have contributed to his subsequent illness."

The only other witness for the defendant was his sister who indicated that the defendant was in an accident in Florida in 1958 and was committed to a psychiatric unit in Florida for some five weeks following hospitalization for the accident. The defendant did not testify in his own behalf.

Other pertinent facts in evidence will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Associate Attorney Joan H. Byers for the State.*

*Peter L. Roda, Public Defender for Buncombe County, for defendant appellant.*

COPELAND, Justice.

[1] The defendant first assigns as error that the court failed to instruct the jury as to the effect of insanity or mental weakness on premeditation and deliberation.

The court instructed the jury as to the proper test for determining whether or not defendant was legally sane at the time of the killing. The defendant requested no further instructions when the trial judge made inquiry about it. Our Court

has previously ruled on this particular problem in two recent cases, *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975), and *State v. Wetmore,* 287 N.C. 344, 215 S.E. 2d 51 (1975). In *Wetmore* our Court discussed, but clearly did not adopt, what has been called the theory of diminished responsibility with respect to the specific intent to commit a crime such as first-degree murder. Under this theory, some of the States hold that a defendant may offer evidence of an unusual or abnormal mental condition which is not sufficient to establish legal insanity, but tends to show that he did not have the capacity to premeditate or deliberate at the time of the murder.

Finally, as to this first assignment of error, in this type of murder the State must prove beyond a reasonable doubt that the killing was with premeditation and deliberation. G.S. 14-17; Strong, N. C. Index 2d, Homicide, § 4, and numerous cases therein cited. "[A] specific intent to kill is a necessary ingredient of premeditation and deliberation. [Citations omitted.] It follows, necessarily, that a defendant who does not have the mental capacity to form an intent to kill, or to premediate and deliberate upon the killing, cannot be convicted of murder in the first degree, . . . The jury by its verdict, has established that the defendant, at the time of the alleged offenses, had the mental capacity to know right from wrong with reference to these acts. . . . That finding, supported as it is by ample evidence, is conclusive on appeal, . . . " *State v. Cooper, supra,* at 572, 213 S.E. 2d at 320. This is so even though the opinion of Dr. Rollins was to the contrary as indicated in assignments of error discussed below. This assignment of error is overruled.

Defendant's Assignment of Error No. 2 is the denial of his motion to nonsuit at the close of the State's evidence and at the close of all the evidence.

On a motion for nonsuit the evidence for the State must be considered in its most favorable light and should be taken to be true. Conflicts and discrepancies in the evidence should be resolved in the State's favor. *State v. Cooper, supra; State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967).

[2]   In our situation, the motion for nonsuit as to first-degree murder was primarily based on defendant's claim that at the time of the killing, the defendant was insane, and, therefore, not responsible for his acts. In addition, the defendant contends

the State has failed to prove beyond a reasonable doubt that the killing was with premeditation and deliberation.

The evidence indicates sanity as well as premeditation and deliberation. Three witnesses and a police officer saw and heard the defendant shortly after the killing. Mary Jo Jarvis arrived at the scene of the killing and observed the defendant. She heard him say, "I just killed my wife and shot myself." Later the defendant walked up closer to Mrs. Jarvis and said, "Please get my mother, I haven't got long to live, I want my mother." William C. Autry came upon the scene and saw a woman lying out in the road and a rifle nearby. He went to a telephone and reported this to the police authorities. When he returned, he found that the body of the woman had been moved to the side of the road. He saw the defendant kneeling beside her. The defendant twice told him that he had killed the woman and that he had caught her with some men up on the mountain. The defendant had apparently been shot in the chest at this time. Defendant, who was partly crying at the time, also said to Mr. Autry, "I'm shot, and I'm dying." Frank Tweed observed the defendant at the scene and heard him say, "I killed my wife." R. D. Poore, a detective sergeant with the Asheville police, made the investigation. He identified the Remington .22 caliber semi-automatic rifle, a butt loader that only shoots .22 caliber long shells. He found fourteen spent .22 cartridges there on the pavement. The police officer later went to the hospital and saw the defendant. A voir dire hearing was conducted by the court and it was determined that the statements made by defendant to the police officer were admissible. After the defendant had been advised that he could call an attorney or a friend, he said to the police officer: "I don't want no counsel or call nobody. I've shot my wife. I've killed my wife and I want to die." He then added that he killed his wife because he caught her running around with a man; that she was no good but that he loved her. These statements were made by the defendant not in response to any question from the police officer.

Dr. Rollins, a medical expert specializing in the field of psychiatry and now Director of the Forensic Unit at Dorothea Dix Hospital, gave as his opinion that the defendant was unable to distinguish right from wrong at the time of the killing. Unfortunately, Dr. Rollins did not examine the defendant until more than five years after the killing. In the meantime he had been under the care of Dr. Laczko, now deceased. Dr. Laczko

State v. Shepherd

did not see the defendant until more than three months after the killing. Dr. Rollins had to base his opinion upon the records of Dr. Laczko and his personal examinations more than five years after the killing. It is interesting to note that Dr. Rollins on cross-examination admitted that the murder could have contributed to the defendant's unstable mental condition when he entered Dorothea Dix Hospital on 19 December 1966.

The witnesses and the police officer observed the defendant immediately after the crime. Certainly what they observed at the time did not indicate insanity. These actions, shortly after the slaying, tend to show that the defendant did know right from wrong and that he knew that he had killed his wife. He was obviously remorseful and tried to justify what he had done by the explanation that she was running around with one or more men. Certainly, as Dr. Rollins indicated, the fact that the defendant had committed this crime probably could have contributed to his subsequent depression and mental illness. In view of the evidence, the question of legal insanity was for the jury to decide.

On 26 August 1975 counsel for defendant filed with this Court a memorandum of additional authority, to wit, *Mullaney v. Wilbur,* 17 Cri. 3063, 44 L.Ed. 2d 508 (1975), to sustain these contentions. *Mullaney* was not based on a plea of insanity and is no authority for these assignments of error.

As indicated above, defendant also contends the evidence was insufficient to satisfy the jury with respect to premeditation and deliberation.

> "Of course, ordinarily, it is not possible to prove premeditation and deliberation by direct evidence. Therefore these elements of first-degree murder must be established by proof of circumstances from which they may be inferred. [Citations omitted.] Among the circumstances to be considered by the jury in determining whether a killing was with premeditation and deliberation are: Want of provocation on the part of the deceased; the conduct of the defendant before and after the killing; the use of grossly excessive force; or the dealing of lethal blows after the deceased has been felled." *State v. Buchanan,* 287 N.C. 408, 420-21, 215 S.E. 2d 80, 87-88 (1975).

In our case, premeditation and deliberation can be inferred from (1) the lack of any evidence to indicate provocation on

the part of the deceased; (2) the statements of the defendant made shortly after the killing giving the reason for the murder, to wit, the deceased was running around with one or more men; and (3) the use of grossly excessive force by the apparent firing of the entire load of fourteen cartridges from a semi-automatic rifle, with four of the bullets striking the deceased in the back. The defendant has failed to show any merit in these assignments of error and they are overruled.

[3]    The defendant assigns as error the charge of the court to the jury that reasonable doubt was "not a doubt suggested by the ingenuity of counsel or your own ingenuity not legitimately warranted by the testimony." It is the law that a trial judge is not required to define "reasonable doubt" without a request to do so, but if he does undertake to define it, the definition should be in substantial accord with the definitions of this Court. *State v. Hammonds*, 241 N.C. 226, 232, 85 S.E. 2d 133, 138 (1954); *State v. Steele*, 190 N.C. 506, 512, 130 S.E. 308, 312 (1925). The charge given was suggested by our Court in *Steele* and approved by our Court in *Hammonds*. The charge given as to reasonable doubt was correct and conforms to our requirements. This assignment of error is without merit and is overruled.

[4]    The defendant next assigns as error the court's instruction to the jury to think about the evidence and arguments of counsel overnight before the court gave its charge. The judge stated that it was the usual custom to keep a jury housed overnight in a case of this type, but that the court would allow them to go home with the following instruction:

"First is that you will not discuss the case with anyone in the interest of fairness. Don't talk about it with your wife, husband, friend, or family at all. Just don't mention it overnight. Think about the evidence and the arguments, but do not discuss it. Do not receive any information about the case in any way, Members of the Jury, that is, now, by radio, or by newspaper, or from any person by way of telephone. Walk away from it or do not listen to it or do not read it. Don't receive any information about it.

"Again, Members of the Jury, in the interest of fairness, don't do anything overnight, Ladies and Gentlemen of the Jury, which would in any way cast any detrimental reflection upon your high and important position as a

fair and impartial juror in the trial of this case that is now under consideration."

The instruction as given was completely fair and this assignment of error is totally without merit. *State v. Dalton,* 206 N.C. 507, 174 S.E. 422 (1934).

[5]  Counsel for the defendant next contends that the court erred in telling the jury to take a ten minute break after the charge before going to the jury room. At this stage, the trial judge had every reason to believe that the deliberations of the jury could be long and tedious. Certainly there was nothing wrong with this act of courtesy by the trial judge. This assignment of error is totally without merit.

[6]  Finally, the defendant contends the court erred in denying his motion to set aside the verdict as contrary to the weight of the evidence. If the motion had been based on the insufficiency of the evidence, the question of law would be the same as that raised by a motion for nonsuit. But here the motion is for the alleged reason that it is "contrary to the weight of the evidence." Under this motion the trial court is "[V]ested with the discretionary authority to set aside a verdict and order a new trial whenever in his opinion the verdict is contrary to the greater weight of the credible testimony." *Roberts v. Hill,* 240 N.C. 373, 380, 82 S.E. 2d 373, 380 (1954). The decision of the court involves the exercise of its discretion. This is a question of law and not reviewable. *Roberts v. Hill, supra.* This assignment of error is overruled.

Examination of the entire record discloses that the defendant received a fair trial, free from prejudicial error. The verdict and judgment must therefore be upheld.

No error.