STATE OF NORTH CAROLINA v. ROY ROGER WILLARD

No. 66

(Filed 11 November 1977)

1. Criminal Law § 113.9— jury instructions—misstatement of evidence—necessity for calling judge's attention to

Slight inadvertences by the judge in his recapitulation of the evidence in his charge to the jury must be brought to the attention of the judge in time for him to make a correction, and an objection thereto after the verdict comes too late.

2. Criminal Law § 113.1— first degree murder—jury instructions—recapitulation of evidence—no error

In a first degree murder case defendant was not prejudiced where: (1) the trial court in recapitulating the evidence stated where defendant went when he was absent from his work on the night before the murder, since such evidence was immaterial; (2) the trial court stated that the victim's blood ran into the rear floor of defendant's automobile and defendant removed carpet from the car after the victim was buried, even if such instruction was based on improperly admitted evidence, since defendant had made no objection to the evidence; (3) the court instructed that a witness testified that a bullet was taken from the head of deceased and it was badly deteriorated, since there was no objection to that testimony and it could not have prejudiced defendant; (4) there was a slight variance between a witness's testimony concerning his finding defendant asleep in an automobile at defendant's place of employment and the trial court's recapitulation of that testimony; and (5) the trial court's recapitulation of defendant's testimony was subject to a different construction than that intended by defendant, since defendant's own testimony was more prejudicial to him than the court's recapitulation.

---

**3. Homicide § 17— defendant's statements prior to crime—admissibility to show motive**

The trial court in a first degree murder prosecution did not err in allowing a witness to testify that, shortly before the disappearance of the victim, defendant discussed with the witness what he would do in the event the victim broke up with him, saying that he had picked out the spot in which to bury her and that he would "rather see her dead if he couldn't have her," since a defendant's own statements to another tending to show jealousy, malice or ill will toward the person with whose killing he is charged and tending to show that he was contemplating the killing of such person are admissible to establish motive.

**4. Criminal Law § 162.5— objectionable evidence—no motion to strike**

Testimony by a witness with whom defendant discussed the possibility of committing the crime in question that defendant, at the time of such conversation, "was very nervous" and that "he was not even attending to his job" was properly admitted, since this was testimony as to facts observed by the witness; however, the trial court properly sustained defendant's objection to further testimony by the witness that when the witness would ask as to defendant's whereabouts, "They would say that he was laying up or something," but the court did not err in failing to instruct the jury to disregard such testimony, since defendant made no motion to strike and made no request for such an instruction.

**5. Criminal Law § 88.4— murder suspect's behavior after crime—cross-examination proper**

The trial court in a first degree murder prosecution did not err in allowing the prosecuting attorney to question defendant concerning his reasons for continuing to phone the victim's mother right up until the time the victim's body was exhumed two months after her death, although defendant testified that he had been told two days after the murder that the victim had been shot.

**6. Criminal Law § 117.4— accomplice testimony—jury instructions proper**

The trial court in a first degree murder prosecution properly instructed the jury as to the consideration to be given to an accomplice's testimony where the court instructed that other offenses and convictions could be considered with other evidence of the witness's truthfulness in deciding whether the jury would believe the witness, and the court instructed that the accomplice's testimony should be carefully scrutinized.

**7. Criminal Law §§ 113.5, 161.1— alibi evidence—no request for instruction—no exception—issue first raised in brief**

Defendant's contention that the trial court erred by failing to give the jury specific instructions as to the legal principles applicable in consideration of alibi evidence is without merit since defendant failed to request such an instruction, and the court is not required to give such instruction absent a request; moreover, defendant failed to comply with Rule 10 of the Rules of Appellate Procedure providing that the scope of review on appeal is confined to consideration of exceptions set out and made the basis of assignments of error in the record on appeal.

APPEAL by defendant from *Seay, J.*, at the 28 February 1977 Session of SURRY.

Upon an indictment, proper in form, the defendant was tried and found guilty of murder in the first degree and sentenced to imprisonment for life.

The following facts, shown by the evidence, are not in controversy:

On 23 July 1976, Barbara Evans, a 26 year old Negro woman, who had for several years been the mistress of the defendant, a 52 year old white man, was living in the home of her mother in Mount Airy. On that date, she disappeared and was not thereafter seen alive. On 21 September 1976, her body, identified by her high school class ring and clothing, was found in a shallow grave in a wooded area in Carroll County, Virginia. During the morning of 23 July, she left her mother's home in a Chrysler automobile owned and driven by the defendant, Randall Tolbert, a 17 year old white boy, being also a passenger in the car.

On 25 July, at approximately 11:00 p.m., the defendant was taken to the hospital with a severe bullet wound in his abdomen and the police were advised that he had been robbed of his automobile and shot at the Miller Fairlane Market in Surry County by two Negro men. After the defendant was shot, his car was driven over the State line into Virginia and burned, the interior being virtually destroyed but it being still apparent that parts of the carpet in the rear had been cut out.

On the morning of 23 July, prior to picking up Barbara Evans at her home, the defendant traded a .22 rifle for a Derringer pistol. After test firing the Derringer and ascertaining that it did not fire dependably, the defendant took it back to the man from whom he had acquired it and exchanged it for a .32 H & R revolver, which was introduced in evidence.

Subsequently, Tolbert was arrested for a burglary unrelated to any of these matters. While in custody on that charge, he gave a statement to police officers concerning the killing of Barbara Evans and the shooting of the defendant. Thereupon, he directed the officers to Barbara Evans' grave and accompanied them thereto, at which time her body was exhumed.

In addition to evidence showing the foregoing facts, which are not controverted, the evidence for the State included testimony of Roy Lee Flippin and Tolbert.

Flippin testified:

The defendant discussed with him "right much" his relationship with Barbara Evans for whom the defendant "really cared a whole lot." The defendant told Flippin on one occasion prior to the disappearance of Barbara Evans, "You know, I even drove out to the parkway where it was not close to anyone's house and picked out a spot to bury Barbara," and also said, "I even got a shovel and mattocks in my car," and "he would rather see her dead if he couldn't have her."

Randall Tolbert testified:

Over a period of approximately one month prior to 23 July 1976, he and the defendant discussed the killing of Barbara Evans, the defendant agreeing to pay Tolbert $500.00 therefor. Three times they planned for the defendant to bring Barbara Evans to one of their customary parking places and for Tolbert to conceal himself in the surrounding undergrowth and shoot her upon a signal from the defendant. On each of these occasions, "something went wrong" and the attempt was not made. They then decided upon the plan which was carried into effect on 23 July. This plan was to "lure Barbara away" on the pretext that her car radio needed repair.

Pursuant to this plan, the defendant, as above stated, procured first the Derringer and then the .32 caliber pistol actually used to kill Barbara Evans, both of which guns Tolbert tested in the defendant's presence, finding the .32 pistol satisfactory. On the morning of 23 July, the defendant and Tolbert went to the Evans home in the defendant's car. The defendant obtained Barbara Evans' car and drove it away, Tolbert following in the defendant's car. Parking Barbara Evans' car in another area of the city, they then proceeded to get the .32 caliber pistol as above mentioned.

The defendant then telephoned Barbara Evans that some mechanical work was to be done on her car radio and she should be present to approve it. Thereupon, they returned to the Evans home in the defendant's Chrysler car, Tolbert posing as a radio

repairman. They picked up Barbara Evans, who got into the front seat with the defendant, Tolbert sitting in the rear seat and having with him the fully loaded .32 caliber pistol. Pursuant to their plan, the defendant drove along a street where there were few houses and, at a point where there were no automobiles or pedestrians in view, Tolbert brought the pistol up to approximately an inch behind Barbara's head and fired one shot. She fell over toward the defendant, who was the driver, and apparently death was instantaneous.

Pursuant to the prearranged plan, the defendant, without stopping, drove on into the State of Virginia (approximately 20 miles from the point where the shooting occurred) and they buried the body in a grave which they had previously prepared, wrapping it in a quilt which they had in the trunk of the car and filling the grave with a shovel which they had in the car. They then returned to Mount Airy and Tolbert removed Barbara Evans' car from the place where he had parked it and hid it near his own home in Virginia. The next day they decided to and did move her car to Winston-Salem and parked it at a housing development in that city.

On the following day, the second day after the killing of Barbara Evans, the defendant decided that, in order to divert suspicion from him, Tolbert should shoot him and stage a robbery of the defendant, who would then report that he had been robbed and shot and his automobile stolen. For that service, the defendant offered to pay Tolbert an additional sum. That plan they carried out at the Miller Fairlane Market in Surry County, Tolbert shooting the defendant in the abdomen at the point designated by the defendant. Prior to the shooting, the defendant telephoned the telephone operator and told her that a man had been shot and she should send an ambulance to the described location. Following the shooting of the defendant, Tolbert, also pursuant to the defendant's plan, drove the defendant's Chrysler car into Virginia and there burned it. For all of these services, Tolbert received approximately $180.00.

After Tolbert's arrest on the unrelated robbery charge, he told the police about the killing and burial of Barbara Evans and took them to her grave because these things "bothered him." His signed statement so given to the police was introduced in evidence to corroborate his testimony.

When Barbara Evans was shot, a substantial quantity of blood ran into the floor of the back part of the car. The defendant told Tolbert that he, the defendant, had cut out part of the carpet so as to remove evidence of bloodstains. Tolbert observed that part of the carpet had been so cut out before he burned the car.

The State also introduced evidence to the effect that an autopsy was performed on Barbara Evans' body and a bullet was removed therefrom.

The defendant, a witness in his own behalf, testified:

He had been going with Barbara Evans for approximately four years and thought a great deal of her. He did not have anything to do with her murder. He did not cut the carpet out of his car. He did not go with Tolbert to the gravesite and knows nothing about the grave. He acquired first the Derringer and then the .32 caliber pistol for the purpose of giving it to Barbara Evans pursuant to her previous request that he get a gun for her. He did not make the statement attributed to him by Roy Lee Flippin.

When he, himself, was shot by Tolbert, he had met Tolbert and his companion pursuant to a telephone call from Tolbert stating that he had information concerning Barbara Evans. Tolbert told the defendant that he, the defendant, would not have to worry about Barbara any more. When the defendant asked Tolbert what he meant by that, Tolbert replied, "You know, the place where I carried you to meet her several times" (referring to the place in Virginia which the defendant and Barbara had frequently used for their meetings). Tolbert then said that Barbara Evans was over there and she was dead. When Tolbert so stated, the defendant reached "to get him" and at that time Tolbert shot the defendant. Tolbert then took the defendant's billfold and watch and told the defendant that if the defendant ever said anything about this shooting and robbery Tolbert could pin the Evans murder on the defendant. When the police officers came as the result of the shooting of the defendant, the defendant told them that two black men had shot him, his reason being that he knew Tolbert and his companion could "pin it on him."

On 23 July, the defendant and Tolbert went to the Evans home about 6:15 a.m. and the defendant drove Barbara Evans' car to the parking lot of the mill where the defendant was employed, Tolbert following in the defendant's car. The defendant, a super-

visor in the mill, went in to see that his department was operating satisfactorily. After so doing, he requested and received permission to leave for the better part of the day. He and Tolbert then left the mill and procured the pistols above mentioned.

They then went back to the mill, telephoned Barbara Evans and returned to the Evans home shortly after 9:00 a.m. After talking to Barbara Evans a few minutes the three of them left together. As they passed the post office, Tolbert got out and the defendant carried Barbara Evans to her car where the defendant had parked it and Barbara Evans got in it. At that time, another automobile came by with a Negro man in it and Barbara Evans said that she needed to see him and drove away, telling the defendant that she would meet him at the bank at 11:00 a.m. She failed to keep that appointment.

The defendant then returned to the mill and, at approximately 11:50 a.m., Barbara Evans telephoned him saying that she would meet him at the bank at 4:00 p.m. She did not keep that appointment. Thereupon, the defendant called her mother and they decided to try to find Barbara. Until about 1:00 a.m. he searched unsuccessfully for her in the Negro section of Winston-Salem where Barbara Evans frequently went to visit. He never saw Barbara Evans again after she drove away from the parking lot of the mill that morning. His purpose in getting Barbara Evans' car that morning was to have a radio placed in it. He went back to get Barbara because, after telephoning several people concerning the proposed installation of the radio, he decided to take her to a store in Dobson to see a radio he had located there. He could not drive her car back to her house because, after putting the gun in her car, he had locked the door and the switch key would not fit the door lock. The purpose of Barbara's accompanying him back to the mill parking lot was to enable her to get her car, she not having time to see about the radio that day.

*Rufus L. Edmisten, Attorney General, by Richard L. Griffin, Associate Attorney, for the State.*

*Charles M. Neaves for Defendant.*

LAKE, Justice.

The defendant assigns as error the denial of his pretrial motion to sequester the witnesses for the State. He correctly concedes that this was a matter in the discretion of the trial court. *State v. Felton*, 283 N.C. 368, 196 S.E. 2d 239 (1973); *State v. Cook*, 280 N.C. 642, 187 S.E. 2d 104 (1972); *State v. Yoes* and *Hale v. State*, 271 N.C. 616, 641, 157 S.E. 2d 386 (1967); *State v. Hamilton*, 264 N.C. 277, 286, 141 S.E. 2d 506 (1965), cert. den., 384 U.S. 1020 (1966); Stansbury, North Carolina Evidence (Brandis Rev., 1973), § 20. Nothing in this record suggests abuse of discretion by the trial court in this respect. There is no suggestion of collusion among the witnesses for the State. This assignment of error is without merit.

The defendant's two assignments of error directed to the denial of his motions for judgment of nonsuit at the close of the State's evidence and at the close of all of the evidence are likewise without merit. It is elementary that, for the purpose of ruling upon such a motion, only the evidence offered by the State is considered, except insofar as the evidence for the defendant clarifies and strengthens it, and any discrepancies therein are disregarded, the evidence for the State being deemed true and interpreted in the light most favorable to the State. Strong, N.C. Index 3d, Criminal Law, § 104. "If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged [or a lesser included offense] has been committed and that defendant committed it, a case for the jury is made and nonsuit should be denied." *State v. McKinney*, 288 N.C. 113, 117, 215 S.E. 2d 578 (1975); Strong, N.C. Index 3d, Criminal Law, § 106.2. The evidence of Randall Tolbert alone is sufficient to comply with this test. The credibility of his testimony was for the jury.

The defendant's motion to set the verdict aside on the ground that it is against the weight of the evidence was directed to the discretion of the trial court. *State v. Shepherd*, 288 N.C. 346, 218 S.E. 2d 176 (1975); *State v. Britt*, 285 N.C. 256, 264, 204 S.E. 2d 817 (1974) (new trial allowed on other grounds); Strong, N.C. Index 3d, Criminal Law, § 132. No abuse of discretion appears in the denial of this motion. This assignment of error is, therefore, also without merit.

The defendant's assignment of error based upon the overruling of his motion for arrest of judgment is abandoned, no argument or citation of authority therefor appearing in the brief. Rule 28(a), Rules of Appellate Procedure, 287 N.C. 671, 741.

[1] The defendant's Assignments of Error 9, 10, 11, 12 and 13 relate to alleged errors by the trial court in recapitulating testimony of certain witnesses in the court's charge to the jury. It is well settled that slight inadvertences by the judge in his recapitulation of the evidence in his charge to the jury must be brought to the attention of the judge in time for him to make a correction, and an objection thereto after the verdict comes too late. *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469 (1968); *State v. Cornelius*, 265 N.C. 452, 144 S.E. 2d 203 (1965); Strong, N.C. Index 3d, Criminal Law, § 113.9. Nothing in the record suggests that any alleged inaccuracy in the court's recapitulation of the evidence was brought to the attention of the trial judge. The defendant contends in his brief that these alleged misstatements of the evidence in the charge were not slight inaccuracies but were statements of material facts not shown in evidence or shown only by improperly admitted evidence and, therefore, not within the above mentioned rule. He further contends that three of these alleged errors constituted expressions of opinion by the court as to whether "a fact is fully or sufficiently proven," in violation of G.S. 1-180. We now turn to these alleged misstatements individually.

[2] Roy Lee Flippin was a foreman in the hosiery mill in which the defendant and Randall Tolbert worked, Tolbert working under Flippin's supervision. Flippin testified, without objection:

On Monday, the beginning of the week of July 24 (Saturday) when Tolbert went out he said that he had to go to Hillsville, Virginia (approximately 25 miles from the mill). Tuesday night he did the same thing. He and the defendant went back to Hillsville, or so they told Flippin. On Wednesday, Tolbert worked eight hours. On Thursday night, the defendant came to Flippin's department and said that he had a favor to ask of Flippin, that he had to move some furniture and needed Tolbert to help him with it. When they left, it was before 7:00 o'clock. Then after supper, about 7:30 p.m., Tolbert returned and told Flippin that he had no other choice, that he had to go. Flippin gave him permission, say-

ing: "Randall you have definitely got to punch out if you leave tonight. I have given you two nights but you definitely have to punch out tonight." Tolbert returned at 10:15 p.m. and worked until quitting time. On Friday night, July 23, Tolbert worked a full eight-hour shift.

Previously, Flippin had testified:

On one occasion, a short time prior to July 23, possibly in the early part of that week, pursuant to an incoming telephone call, one of the mill employees told Tolbert a man from the parole office in Hillsville, Virginia, had called and left a message for Tolbert to meet him in Hillsville at 9:00 o'clock that night. Tolbert told Flippin that he did not have a way to get there. The defendant came walking in at that time and told Tolbert that he could carry him there, and they left about 8:00 o'clock and were back about 9:00 o'clock. When they got back, Tolbert said that the parole officer did not get to see him and that he had to go back the next night. . . The defendant said that he would carry Tolbert to Virginia the next night. On the next night, the defendant came to Flippin about 8:00 o'clock and said that he would go ahead and carry Tolbert and that they had to be there at 9:00 o'clock. They left and it was probably 11:00 o'clock when they came back. Flippin does not remember the exact date but believes that this was on Thursday (July 22). When Tolbert returned to the mill, about 11:00 o'clock that night, he was very nervous and told Flippin, "I'll tell you what, I wish that I never got involved with Roy Willard [the defendant]. I wish that I never saw him."

The record does not indicate an objection to any of the foregoing evidence. The court's recapitulation of this portion of Flippin's testimony, which the defendant assigns as error was:

"On Thursday night before July the 23rd, the defendant * * * carried Randy Tolbert to Hillsville, and when they returned it was after 11:00 o'clock and Randy was very nervous and that the next night after that the defendant Willard asked a favor of him and of Randy and that they had left at 8:00 o'clock and it was late when they came back and Randy was also very nervous and stated that he wished he had never gotten involved with Roy Willard."

We find no merit in this assignment of error. Whether the defendant and Tolbert actually went to Hillsville while they were away from the mill on Thursday night is immaterial. Flippin's testimony was that on Thursday night (July 22) Tolbert was absent from his work at the mill from approximately 7:30 p.m. to approximately 10:15 p.m. or 11:00 p.m., having left with the defendant.

The defendant next assigns as error the following portion of the court's recapitulation of the evidence: "That Randy Tolbert was recalled for further testimony that tends to show that when Barbara Evans was shot that she bled in such a way that the blood went between the seat on the rear deck and the defendant removed the carpet after the burial." The defendant asserts that this is a summary of improperly admitted evidence.

Tolbert, on recall, testified that when barbara Evans was shot, she bled and the blood accumulated in the rear floor of the car. With reference to the removal of the carpet from the floor of the back compartment of the car, Tolbert testified, "From all that I know Mr. Willard [the defendant] removed those some time after she was buried." Tolbert testified that he, himself, had nothing to do with the removal or cutting out of parts of the carpet of the car, but the defendant stated that he removed them so that in case anyone looked in the car there would be no evidence of bloodstains.

The record does not indicate any objection to the foregoing testimony by Tolbert. "Evidence admitted without objection, though it should have been excluded had proper objection been made, is entitled to be considered for whatever probative value it may have." Stansbury, North Carolina Evidence (Brandis Rev., 1973), § 27. Furthermore, "Anything that a party to the action has done, said or written, if relevant to the issues and not subject to some specific exclusionary statute or rule, is admissible against him as an admission." Stansbury, North Carolina Evidence (Brandis Rev.), § 167. Thus, there is no merit either in the defendant's Assignment of Error 4, relating to the admission of this testimony by Tolbert, or in his Assignment of Error 10 concerning the court's recapitulation of it in the charge to the jury.

The defendant next assigns as error the following portion of the court's recapitulation of the evidence in his charge to the

jury: "The witness Beal was recalled and testified that the bullet was taken from the head of the deceased but that it had badly deteriorated." In his Assignment of Error 11, the defendant contends that this is a summarization of improperly admitted evidence.

The witness Beal, presently Clerk of the Superior Court of Surry County, but, at the times in question, an agent of the State Bureau of Investigation, testified that he observed the exhumation of the body of Barbara Evans and described the grave and condition of the body. Upon recall he testified, without objection, "An autopsy was performed on Barbara's body. A bullet was removed from her person." When he was asked as to the condition of the bullet, objection was interposed by the defendant. The court inquired as to whether the witness had seen the bullet. The witness replied: "Not when it was removed. I received it in my possession from the pathologist. After it was removed I saw it, yes." Objection to this testimony was overruled. The witness was then asked what was the condition of the bullet and testified, "It was very badly deteriorated in that the body fluids had consumed most of the striation and marking on it."

Since there was no objection thereto, there was no error in admitting this witness' testimony that an autopsy was performed and a bullet removed from the "person" of Barbara Evans. The testimony to which objection was interposed related solely to the condition of the bullet so removed. The testimony that the bullet was badly deteriorated (two months having intervened since the shooting of Barbara Evans) could not possibly have affected the verdict of the jury or been prejudicial to the defendant. Its admission was, therefore, at the most, harmless error and so was the court's statement to that effect in its recapitulation of the testimony of this witness. Actually, the witness did not testify that the bullet was taken from the head of the deceased, but the testimony of Tolbert was quite specific that he shot Barbara Evans only one time and shot her in the back of the head. This variance between the court's recapitulation and the properly admitted testimony of the witness concerning the removal of a bullet from the "person" was clearly an inadvertent misstatement and the defendant does not make any point thereof or refer to it in his brief. Consequently, neither Assignment of Error 5, relating to the admission of the testimony of this witness, nor Assign-

ment of Error 11, relating to the court's recapitulation thereof in its charge to the jury, is basis for a granting of a new trial and these assignments are overruled.

The defendant's witness, Paul Glenn, testified that he also works at the mill where the defendant and Tolbert were employed and on the morning of Saturday, July 24, he observed the defendant asleep in the back seat of the defendant's Chrysler car in the mill parking lot between 7:30 a.m. and 8:00 a.m. Glenn went to the car, knocked on the side glass and the defendant rose up out of the back seat. The sun was shining into the car and Glenn looked at the back floorboard but did not see any piece of the carpet cut out or any blood on the floor. He had a good look at the floor in the back of the car and did not see anything out of the ordinary in the front part of the car. He further testified that there was nothing unusual about the defendant's car being in the parking lot as it was there almost every morning, but on this morning "something hit his mind" and he said to Randy Penn that he wondered if the defendant was asleep in his car. He then testified:

It was on the Monday following the Saturday on which he saw the defendant asleep in his car that he heard about the defendant's being suspected of murder. He (Glenn) did not know that nobody knew what happened to Barbara until September 21st. He (Glenn) did not remember that her body was not dug up until then. He has some difficulty in remembering people and dates. On Monday morning after he saw the defendant asleep in the car, Tolbert told him that the defendant had been shot.

After correctly recapitulating the testimony of Glenn concerning his awakening the defendant, looking into the back of the car and observing no blood and no cut out place in the carpet, the charge of the court continued as follows:

"On cross-examination he testified that he was late going to work as he went to the late show and that he just happened to ask somebody whether or not they would believe that Kay Ro [the defendant's nickname] was sleeping in the car there before he went into work and he remembered it being a Saturday morning and remembers that the next Monday following that Saturday that the defendant had been

arrested and suspected of murder. He did not know that the body had been dug up on September the 21st, and did not know what Saturday except it was the Saturday morning following the defendant being arrested for murder. On cross-examination, he said that he recalls that was the Saturday following the defendant being shot. That on that occasion that the defendant was in the blue Chrysler."

The defendant contends that the variance between the court's recapitulation and the testimony of Glenn as shown in the record constitutes prejudicial error. We do not so regard it. We observe no material variance. If the defendant deemed such variance as appears in the record to have been prejudicial to him, he should have directed this to the attention of the court in time for a correction prior to the verdict. In this assignment of error we find no merit.

The defendant, himself, testified that while he was in the hospital as the result of his being shot by Tolbert, he had a visit from Tolbert who said that the defendant was "doing well," and told him "to just keep up the good work and that he wouldn't have any problems"; "to keep up what he was doing and everything would be fine." Immediately prior to this testimony, the defendant had testified that, at the time Tolbert shot him, Tolbert told him that if he ever said anything about that shooting and robbery, Tolbert "had him where he wanted him" and "he could pin it on" the defendant. In consequence of this, the defendant told the officers who were investigating the shooting that two black men shot him. On cross-examination, the defendant testified that when Tolbert visited him at the hospital, Tolbert asked the defendant not to say anything, to keep it up and he (Tolbert) wouldn't pin anything on the defendant. By this remark, said the defendant, Tolbert "was talking about Barbara."

In recapitulating this testimony by the defendant, the court said that the defendant had testified that, at the time the defendant, himself, was shot, Tolbert told him "that he would not have to worry about Barbara Evans any more as she was dead and when Randy told him that, that he, the defendant, reached to get him and Randy shot him in the stomach and took his wallet and left in the car and said if he told anything about it why he could pin this killing on him * * * and when the police arrived that he told the police it was two black men that shot him and he was at

the hospital some time and Tolbert came to see him at the hospital and said that he was doing real well."

In his Assignment of Error 13, the defendant asserts that, in this recapitulation of his testimony, the court erred for the reason that the court's statement of the testimony was misleading or subject to misleading construction. The defendant asserts in his brief that the court's charge "might be construed as summarizing Tolbert's statement that the defendant 'was doing real well' as referring to the state of the defendant's health in recovery from the gunshot wound inflicted by Tolbert," while the testimony of the defendant "does not leave open the possibility for such ambiguous construction." We find no substantial variance between the testimony of the defendant and recapitulation thereof by the court, but if the court's recapitulation could have been construed by the jury as the defendant, in his brief, has construed it, we do not see how that could possibly have been detrimental to the defendant. Surely, the defendant's own testimony that he withheld from the officers the identity of his own assailant because he knew that Tolbert "could pin" the shooting of Barbara Evans on him and that this was what Tolbert meant by saying the defendant was "doing real well" and by telling him to "keep up the good work" and "not to say anything" was more prejudicial to the defendant than would have been the alleged possible construction of the court's recapitulation of the defendant's testimony. There is no merit in this assignment of error.

[3]  The defendant's Assignments of Error 2 and 3 relate to the admission, over objection, of the testimony of Roy Lee Flippin that, shortly before the disappearance of Barbara Evans, the defendant had discussed with Flippin what he would do in the event that Barbara "broke up with him," saying that he had picked out the spot in which to bury Barbara and that he would "rather see her dead if he couldn't have her."

In the admission of this evidence, there clearly was no error. The defendant's own statements to another tending to show jealousy, malice or ill will toward the person with whose killing he is charged and tending to show that he was contemplating the killing of such person are clearly admissible in evidence. Such admissions constitute a well established exception to the Hearsay Rule. Stansbury, North Carolina Evidence (Brandis Rev.), § 161. As Justice Branch, speaking for this Court, said in *State v. Rob-*

*bins*, 275 N.C. 537, 546, 169 S.E. 2d 858 (1969): "It is well settled law in this jurisdiction that in a criminal prosecution admissions of fact by a defendant pertinent to the issue which tend to prove his guilt of the offense charged are competent against him. *State v. Porth*, 269 N.C. 329, 153 S.E. 2d 10; *State v. Woolard*, 260 N.C. 133, 132 S.E. 2d 364; *State v. Abernethy*, 220 N.C. 226, 17 S.E. 2d 25; *State v. Lawhorn*, 88 N.C. 634. * * * The testimony here offered tended to establish motive on the part of defendant to commit the crime and to otherwise establish his guilt."

[4]  The testimony of Flippin that at the time of this conversation the defendant "was very nervous" and that "he was not even attending to his job" was properly admitted, even if the defendant objected to the question in answer to which this testimony was given, which the record does not indicate. This was testimony as to facts observed by Flippin. The court sustained the defendant's objection to Flippin's further testimony in response to this question to the effect that when he (Flippin) would ask as to the defendant's whereabouts, "They would say that he was laying up or something." This statement was inadmissible hearsay and, as to that part of the answer, the court properly sustained the objection. The defendant did not, however, move to strike this statement of the witness nor did he request the court to instruct the jury to disregard it. Consequently, the failure of the court to so instruct the jury was not error. *State v. Lefevers*, 216 N.C. 494, 496, 5 S.E. 2d 552 (1939). In these assignments of error, we find no merit.

[5]  The defendant testified that he continued to make telephone calls to the mother of Barbara Evans right up to the time when Barbara's body was exhumed in September, although Tolbert, according to the defendant, had told him just prior to shooting him on July 25 that he (Tolbert) had killed and buried Barbara at the place in Virginia where the defendant and Barbara frequently met. He testified that in these telephone conversations he did not intimate to Barbara Evans' mother where Barbara's body was. The prosecuting attorney then asked, "After you had been assured that she was dead and buried why did you continue to call Mrs. Evans leading her to believe, by inference at least, that Barbara might be alive?" The defendant objected "to the solicitor's statement," which objection was overruled. The prosecuting attorney then asked if the defendant did not intend by his

continuing telephone calls "to imply that she was still alive and there was a possibility that she might be found." The defendant replied, "No, sir, I went to her house several times." He then testified that on these visits he talked to Barbara Evans' mother, asked if she had heard from Barbara and told her that he had heard nothing from her and would be "making inquiries."

In his Assignment of Error 7, the defendant asserts that the court erred in the admission of these "statements" of the prosecuting attorney. In this contention we find no merit.

Also in his Assignment of Error 7, the defendant contends that the court erred in permitting the prosecuting attorney to ask the defendant, on cross-examination, "On two or three occasions was Randy [Tolbert] in ambush when you were bringing Barbara to one of the parking spaces for the purpose of having her shot?" To this the defendant answered, "Absolutely not." The defendant now contends that this question was framed so as to assume a fact not in evidence, namely, that the defendant on two or three occasions took Barbara to such places for the purpose of having her shot. There are two independently sufficient answers to this assignment of error. First, the defendant did not object to the question. Second, Tolbert had previously testified that, pursuant to the plan he and the defendant had made, he twice concealed himself near the defendant's "favorite parking place" in order to shoot Barbara Evans when the defendant brought her there and signaled to him to do so. There is no merit in this assignment of error.

Tolbert testified that he, himself, was, at the time he was so testifying, indicted and charged with the murder of Barbara Evans, that his attorney was then present in the courtroom, that he had been fully advised of his rights in this matter and was voluntarily testifying as a witness for the State without any promises having been made as to what might happen in his case when he should be brought to trial. He also testified that he, himself, was then under an indictment for another, unrelated robbery, that he had committed still another robbery in Galax, Virginia, and that sometimes he stole money from the mill where he was employed for the purpose of buying drugs.

The court instructed the jury:

"Now the witness Randy Tolbert has testified that he has been charged in this case with the murder of Barbara

Evans and he has been charged with the armed robbery of the Millers and certain other offenses and you may consider the matter of any previous convictions, members of the jury, as it may bear on the truthfulness of this witness and you may consider it together with all of the other facts and circumstances bearing on the witness' truthfulness in deciding whether you will believe or disbelieve his other testimony at this trial. Except as it may bear on this decision this evidence should not be considered by you in your determination of the truthfulness of the witness in this case.

"There is, insofar as the testimony of Randy Tolbert is concerned, members of the jury, there is evidence in this case which tends to show that he, Randy Tolbert, was an accomplice in the commission of the crime charged in this case. An accomplice is a person that joins in with another in the commission of a crime. The accomplice may actually take part in the acts necessary to accomplish the crime or he may knowingly help or encourage another in the crime, either before or during its commission. An accomplice is considered by the law to have an interest in the outcome of the case. You should examine every part of the testimony of this witness Randy Tolbert with the greatest care and caution and scrutinize his testimony fully. If after doing so you believe his testimony in whole or in part you will treat what part you believe the same as any other believable evidence."

[6] For his Assignment of Error 14, the defendant contends that the second above quoted paragraph of this instruction is correct but the first paragraph above quoted is erroneous and "tends to negate" the second paragraph of the instruction. The defendant asserts in his brief, "The jury might well have construed the excepted portion of the instruction to mean that they were to consider the fact of Tolbert's being charged with the same murder for which the defendant was standing trial as relating only to Tolbert's veracity." We find no error in either of these two paragraphs quoted from the judge's charge to the jury and no merit in this assignment of error.

[7] In his statement of the case on appeal, the defendant made only the 16 assignments of error above discussed. In his brief he makes, for the first time, Assignment 17, which is not based upon any exception in the record. Rule 10 of the Rules of Appellate

Procedure, 287 N.C. 679, 698, provides the scope of review on appeal is confined to consideration of exceptions set out and made the basis of assignments of error in the record on appeal, except as otherwise provided in that rule. Nevertheless, the defendant requests this Court, in its discretion, to find that the trial court erred by failing to give the jury "specific instructions as to the legal principles applicable in the consideration of alibi evidence."

The defendant testified as to his activities within the Town of Mount Airy during the morning of July 23, and introduced other evidence designed to show his presence therein during parts of that morning, the purpose of such evidence being to show that he was not then engaged, with Tolbert, in the killing and burial of Barbara Evans. The jury was properly and fully instructed by the court as to the State's burden of proof beyond a reasonable doubt that the defendant is guilty of the crime charged.

In *State v. Hunt*, 283 N.C. 617, 197 S.E. 2d 513 (1973), a new trial was awarded because of the trial court's failure to charge the jury as to the legal principles applicable in their consideration of alibi evidence, even though there was no request for such an instruction, there having been evidence offered by the defendant in that case tending to show he was elsewhere when, according to the State's evidence, the crimes for which he was indicted were committed. However, in *State v. Hunt, supra,* we overruled former decisions of this Court declaring it to be the duty of the trial court so to instruct, even in the absence of a request for such an instruction, when there is alibi evidence and we expressly stated that in cases arising thereafter (i.e., in the present case) "the court is not required to give such an instruction unless it is requested by the defendant." In the present case, there was no such request by the defendant. Consequently, this contention of the defendant is without merit, even apart from Rule 10 of the Rules of Appellate Procedure.

The defendant's counsel has zealously, and at great length, endeavored in his brief to substantiate his contentions that in his trial errors were committed entitling him to a new trial. In that endeavor, he has grasped at 17 straws which, individually and collectively, fail to support him. He has had a fair trial in accordance with the law of this State. The conflict between his testimony, asserting his innocence of the charge of murder of Barbara Evans,

and the testimony of Randall Tolbert, the self-confessed trigger man, that the defendant planned the murder, employed Tolbert to perpetrate it, and was present and participated in its accomplishment simply raised a question of fact for the jury, which believed Tolbert and not the defendant.

No error.