STATE OF NORTH CAROLINA v. BRUCE FRANKLIN JERRETT

No. 228A82

(Filed 27 September 1983)

1. **Criminal Law § 15.1— test for change of venue for pretrial publicity**

    A defendant's motion for a change of venue should be granted when he establishes that it is reasonably likely that prospective jurors will base their decision in the case upon pretrial information rather than the evidence presented at trial and will be unable to remove from their minds any preconceived impressions they might have formed. When such a likelihood is shown to exist, a defendant's right to a fair trial by an impartial jury far outweighs the interest local residents have in trying a defendant in that county.

2. **Criminal Law § 15.1— change of venue for pretrial publicity—showing of identifiable prejudice not required**

    A showing of identifiable prejudice was not required to entitle defendant to a change of venue because of pretrial publicity where the totality of the circumstances showed that there was such a probability that prejudice would result that defendant would be denied due process if venue were not changed.

**3. Criminal Law § 15.1— change of venue for pretrial publicity — likelihood of un-fair trial — totality of circumstances**

In a prosecution for first degree murder, felonious breaking and entering, kidnapping and armed robbery, defendant met his burden of showing by a totality of the circumstances that a reasonable likelihood existed that he could not receive a fair trial before an Alleghany County jury, and the court erred in denying defendant's motions for a change of venue made prior to trial and during the trial, where the crimes occurred in a small, rural, closely-knit county which in its entirety was, in effect, a neighborhood; defendant presented at the pretrial hearing the testimony of several attorneys, a magistrate, and a deputy sheriff who expressed opinions that it would be extremely difficult, if not impossible, to select a jury comprised of individuals who had not heard about the case, that due to the publicity surrounding the case, potential jurors were likely to have formed preconceived opinions about defendant's guilt, and that defendant would not receive a fair trial in the county; and the jury voir dire, conducted after the denial of defendant's motion that the jury be individually selected, revealed that many of the potential jurors stated that they knew the victim or potential State's witnesses, that they had already formed opinions in the case, or that they could not give defendant a fair trial.

**4. Kidnapping § 1— indictment for first degree kidnapping**

A proper indictment for first degree kidnapping must not only allege the elements of kidnapping set forth in G.S. 14-39(a) but must also allege one of the elements set forth in G.S. 14-39(b), to wit, that defendant did not release the victim in a safe place, that he seriously injured the victim, or that he sexually assaulted the victim.

**5. Kidnapping § 1.3— instructions on "voluntarily" releasing victim in safe place**

The trial court's instructions in a kidnapping case concerning whether defendant "voluntarily" released the victim in a safe place were not erroneous, even though G.S. 14-39(b) does not expressly require that defendant "voluntarily" release the victim in a safe place, since a requirement of voluntariness is inherent in the statute.

**6. Kidnapping § 1.2— failure to release victim in safe place — sufficiency of evidence**

The evidence in a kidnapping case presented a jury question as to whether defendant released the victim in a safe place or whether the victim escaped or was rescued by the presence and intervention of a police officer where it tended to show that, after arriving at a convenience store, defendant and the victim walked toward the store building; defendant, carrying a pistol concealed within his shirt, walked a few feet behind the victim; upon entering the store, the victim walked toward a police officer who was standing in the store and then to the rear of the building where she locked herself in a storage room; defendant did not attempt to stop the victim after they entered the store; and defendant went to the counter and was in the process of purchasing gas when he was confronted and subsequently arrested by the officer.

State v. Jerrett

**7. Robbery § 5.1— armed robbery—instructions—diminished capacity insufficient to negate specific intent**

The trial court in an armed robbery case did not err in failing to instruct the jury that even if it did not find that defendant was legally insane at the time the crime was committed, it could find that due to his abnormal mental condition he did not have the requisite intent to commit armed robbery, since diminished capacity may not be used to negate specific intent.

**8. Criminal Law § 5.2— necessity for instruction on unconsciousness**

In a prosecution for first degree murder, felonious breaking and entering, kidnapping and armed robbery, the trial court erred in failing to instruct the jury on the defense of unconsciousness where defendant's testimony that he suffered from a blackout at the time of the crimes was corroborated by testimony of other witnesses that defendant had suffered blackouts on other occasions and by evidence of defendant's peculiar actions in permitting the kidnapping victim repeatedly to ignore his commands and finally to lead him docilely into the presence and custody of a police officer. The instruction given by the trial judge referring to defendant's blackouts amounted only to a partial instruction on the defense of insanity and did not explain the law of unconsciousness or apply that law to the facts of the case.

**9. Criminal Law § 135.3; Jury § 7.11— exclusion of jurors for capital punishment views—failure to explain sentencing process**

The trial court in a first degree murder case did not err in excluding for cause fourteen jurors who unequivocally stated their opposition to the death penalty without explaining prior to the voir dire examination the procedural and substantive aspects of the sentencing process in a capital case.

**10. Criminal Law § 135.4; Privacy § 1— death penalty—no violation of right to privacy**

Imposition of a sentence of death does not violate a defendant's right to privacy.

**11. Criminal Law § 135.4; Homicide § 30— first degree murder—premeditation and deliberation—rule requiring submission of second degree murder—inapplicability to defendant**

The death penalty was not unconstitutionally applied to defendant because at the time of defendant's trial the holding of *State v. Harris*, 290 N.C. 718 (1976), required the trial court in a prosecution for first degree murder on the theory of premeditation and deliberation to submit to the jury the offense of second degree murder, even though the evidence did not support this offense, where defendant was convicted of felony murder.

**12. Criminal Law § 102.9— jury argument—characterizations of defendant unsupported by evidence**

There was no evidence to support the prosecutor's jury argument characterizing defendant as a "conman" and a "disciple of Satan."

**13. Criminal Law § 135.4— first degree murder—sentencing hearing—pecuniary gain aggravating circumstance**

In a sentencing hearing in a first degree murder case, the evidence supported the trial court's submission of the pecuniary gain aggravating circumstance where it tended to show that defendant robbed one victim of $3.00, took cartridges from the victims' dwelling, took money from the murder victim's pockets and then stole the victims' automobile. G.S. 15A-2000(e)(6).

**14. Criminal Law § 135.4— first degree murder—course of conduct aggravating circumstance—kidnapping as violent crime**

Defendant's kidnapping of a murder victim's wife was a crime of violence which supported the trial court's submission of the aggravating circumstance that the murder was part of a course of conduct which included the commission by defendant of other crimes of violence against another person where the evidence tended to show that, after defendant shot the murder victim, he pointed the gun at the victim's wife and forced her to come to him; defendant then dragged the wife about the house and then to the victims' automobile; and during this time and during a drive in the automobile, defendant continued to threaten the wife verbally and by pointing the pistol at her.

**15. Criminal Law § 135.4— first degree murder—instructions on aggravating circumstances outweighing mitigating circumstances**

The trial court's instructions on the jury's duty to recommend the death penalty if it found beyond a reasonable doubt that one or more statutory aggravating circumstances existed, that the aggravating circumstance or circumstances found by it were sufficiently substantial to call for the imposition of the death penalty, and that the aggravating circumstance or circumstances found by it outweighed any mitigating circumstance or circumstances found by it, although not model instructions, were free from prejudicial error.

**16. Criminal Law § 138— aggravating factor in sentencing—pattern of violent conduct which indicated serious danger to society**

In imposing sentences on defendant for kidnapping and felonious breaking and entering, the trial court's finding as an aggravating factor that defendant engaged in a pattern of violent conduct which indicated a serious danger to society was supported by evidence of the bizarre manner in which defendant perpetrated the kidnapping and a crime of murder and by defendant's own testimony that he committed acts of violence upon his sister while "blacked-out."

**17. Criminal Law § 138— aggravating factors in sentencing—sentence necessary to deter others—lesser sentence would depreciate seriousness of crime**

In imposing sentences for kidnapping and felonious breaking and entering, the trial court erred in finding as aggravating factors that lesser sentences would depreciate the seriousness of the crimes and that the sentences were necessary to deter others from committing the same crimes since neither factor relates to the character or conduct of the offender.

Justice MITCHELL dissenting in part and concurring in part.

APPEAL by defendant from the judgment entered by *Rousseau, Judge,* at the 29 March 1982 Criminal Session of ALLEGHANY County Superior Court, and from a ruling by *Davis, Judge,* on 20 October 1981, denying defendant's motion for change of venue or a special venire.

Defendant, Bruce Franklin Jerrett, was charged with the first-degree murder of Dallas Parsons, felonious breaking and entering, kidnapping of Edith Parsons, and armed robbery of Edith Parsons and Tom Parsons.

Prior to trial, defendant moved for a change of venue or, in the alternative, for a special venire from another county. These motions were denied by Judge Davis. The motion for a change of venue was renewed both during and after jury selection and denied by Judge Rousseau.

The evidence presented by the State tended to show:

On 24 July 1981, Dallas Parsons and his wife, Edith Parsons, lived on a dairy farm in the Piney Creek Community near Sparta, North Carolina. Mr. Parsons' brother, Tom Parsons, and nephew, Tony Parsons, also lived at the residence. On that evening, Mrs. Parsons retired at around 11:30 p.m. Her husband, Tom Parsons, and Tony Parsons had gone to bed earlier.

Before retiring Mrs. Parsons locked the front door of the house, but she did not recall locking the back door. She then joined her husband in their bedroom. At around 3:00 a.m., Mrs. Parsons was wakened by gunfire and the lights in the bedroom being turned on. She heard her husband shout "Hey" and "Oh, God." She saw defendant standing by the bedroom door holding a gun in his left hand. His right hand was on the light switch. Defendant had shot Dallas Parsons. He then turned his gun on Mrs. Parsons and ordered her to come to him. Mrs. Parsons was screaming, crying and pleading with defendant not to shoot her. She repeatedly told defendant that he had killed her husband. Defendant again told her to come to him and Mrs. Parsons complied. Defendant then grabbed her by the arm, but at some point allowed Mrs. Parsons to dress.

Defendant picked up a box of .22 caliber cartridges from a chest of drawers in the bedroom and said, "That is what I am looking for."

Tom Parsons called from his room and asked what was going on. Defendant dragged Mrs. Parsons across the hall to Tom's room and pushed the door against Tom's body. He then pushed his gun around the door and demanded that Tom give him his wallet and money. Mr. Parsons gave defendant approximately three dollars in change. In compliance with defendant's order, Tom remained in his room.

Mrs. Parsons then pleaded with defendant to allow her to call the rescue squad. He refused, but agreed to make the call himself. Defendant went to a phone in the kitchen and dialed a number. He told the person he was speaking with to come to the Parsons' residence. He then asked Mrs. Parsons, "What Parsons?" She replied, "Dallas," and defendant relayed this information. He also stated, "You will have to find that out for yourself."

Defendant then took Mrs. Parsons back to her bedroom to get her husband's wallet. She gave defendant approximately eight or nine dollars from the wallet. Defendant and Mrs. Parsons then went outside to the Parsons' automobile but Mrs. Parsons was unable to find the keys. Defendant forced Mrs. Parsons back to the bedroom and obtained the car keys from Dallas Parsons' pants pocket. While in the bedroom, Mrs. Parsons saw that her husband's leg was hanging off the bed. Defendant told her not to touch him. Despite this warning, Mrs. Parsons put her husband's leg back on the bed and put the sheet and blanket over his wound.

Mrs. Parsons and defendant again left the house. Before they entered the car, defendant pulled Mrs. Parsons over to the porch and picked up a blue jean jacket and a milk jug which was half full of a liquid substance. As they returned to the car, defendant told Mrs. Parsons that he was going to drive but she convinced him to allow her to drive. Defendant sat in the right front passenger seat and held his pistol in his left hand pointed toward Mrs. Parsons. He told her that he wanted to go to Tennessee, but Mrs. Parsons disregarded his instruction and drove the car in the opposite direction toward Sparta.

After a short time, Mrs. Parsons told defendant that the car did not have enough gas and that the needle was on empty. As they passed a station defendant said, "Damn you, you passed the gas station." Mrs. Parsons told him that the only place that sold

gas that late in Sparta was "The Pantry." He accused her of lying but permitted her to continue to drive toward "The Pantry." In route, defendant told Mrs. Parsons to slow down because she might attract attention. He also told her to dim the dashboard lights. Before they reached "The Pantry," they met a rescue vehicle with its emergency lights on heading toward the Parsons' residence. When they arrived at "The Pantry," Mrs. Parsons turned the automobile into the parking lot and pulled up to the gas tanks. The lot was well-lighted and Mrs. Parsons saw a marked police car parked near the door. Defendant told Mrs. Parsons that she would pump the gas. She told him that they would have to pay for the gas before the clerk would turn on the pump. He accused her of lying but she assured him she was telling the truth. Defendant and Mrs. Parsons then left the car and walked toward the store. Mrs. Parsons was walking in front of defendant. Defendant had put the pistol in his shirt right above his belt. As Mrs. Parsons walked toward The Pantry, she saw Officer Caudle standing in the store at the counter.

Officer Caudle saw defendant and Mrs. Parsons walking toward the store entrance. Defendant was approximately two feet behind Mrs. Parsons, walking with his head down. Mrs. Parsons was holding her hands in front of her in a prayer-like position. As she neared the door and entered, she was repeating the words, "He's got a gun" and "He's going to kill me."

Defendant came through the door with his hand over his stomach and still looking down. When defendant looked up and saw Officer Caudle, he looked away and went up to the counter. Mrs. Parsons walked toward Officer Caudle and said in a low voice that defendant had a gun in his waistband area. Caudle stepped around her and went to the end of the counter. Mrs. Parsons continued to walk to the back of the store where she locked herself in a storage room.

Officer Caudle then approached defendant who was talking to the store clerk, Mrs. Mildred Pratt, about purchasing gasoline. Caudle asked defendant for his identification and driver's license. Defendant twice asked Caudle "Why?" before producing his license. Caudle then started to search defendant, who seemed surprised. He asked Caudle two or three times why he was being searched and told Caudle that he had no right to search him.

Upon being asked if he had a gun, defendant replied affirmatively and turned his pistol over to the officer. Defendant was then arrested for carrying a concealed weapon and was taken to the patrol car.

Mrs. Parsons told Mrs. Pratt that defendant had shot and killed her husband, and Mrs. Pratt relayed this information to Officer Caudle. Caudle thereupon put handcuffs on defendant who asked why Caudle was doing this. Caudle told defendant that "this lady" [Mrs. Parsons] said that he [defendant] had "shot and killed her husband." Defendant replied, "You can't pay any attention to her. She is half crazy."

Defendant testified in his own behalf. We summarize his testimony as follows:

On the night of 20 July 1981, he was at Delmer Bowens' house and left with the intention of going to Bessie Royal's house. On his way to the Royal house he fell in a creek. The next thing he remembered was walking into "The Pantry" and seeing the officer. Following his service in Vietnam he experienced blackouts, one being while he was still in the service and stationed in Germany. On that occasion he left his barracks and went downtown to talk to a friend. He stayed with the friend until three o'clock a.m. and then started back to the barracks. He recalled walking out the door, but the next thing he remembered was being two miles from the barracks at around 7:00 a.m. He had no recollection of what had transpired during the four hours between 3:00 and 7:00 a.m.

Some two years after he left the service, he was driving his car one night in Maryland. The next thing he remembered was waking the next morning in his bed in his parents' home. He looked out at his car and saw that the whole right side was damaged. He had no idea what had happened.

He had another blackout while visiting his mother. He was talking with his family and suddenly he didn't know what happened. His mother later told him that he got up and "went at [his] sister and pushed her down." He recalled seeing his mother's face and when he regained consciousness he saw his sister on the floor of the kitchen. He did not remember anything about pushing her down. He had not experienced blackouts prior to his tour of duty

in Vietnam. While he was in Vietnam, he was exposed to "Agent Orange," a defoliant used in that region. Defendant further stated that he was examined in Newport News, Virginia for the effects of Agent Orange and was diagnosed as exhibiting symptoms of exposure to the defoliant.

Defendant's mother testified that after he returned home from the service, he experienced numerous blackouts during which he would "throw a fit or something." Afterwards she would tell him about it and he would say that he did not remember the incident.

Defendant's father also testified that he had observed defendant on at least a half dozen occasions during which defendant was experiencing blackouts.

Two psychiatrists were called by defendant as witnesses. Dr. Groce, who examined defendant pursuant to a court order at Dorothea Dix Hospital, testified that he conducted a variety of tests on defendant; that he was familiar with a psychiatric disorder typically found among Vietnam veterans referred to as post-traumatic syndrome; that he did not diagnose defendant as suffering from this malady; and that in his opinion defendant would have been capable of forming the intent to commit the acts with which he was charged. His diagnosis was that defendant was suffering from (1) an adjustment disorder with depressed moods, and (2) episodic alcohol abuse.

Dr. Goode, a psychiatrist at the Bowman Gray Medical Center, testified on *voir dire* that he examined defendant at the courthouse pursuant to a court order; that he had reviewed Dr. Groce's report but felt that the tests conducted at Dix Hospital were inadequate to eliminate a complex partial seizure as a diagnosis of defendant's condition; and that extensive tests including a "CAT" scan would be necessary to make a proper diagnosis. Following the *voir dire*, the trial court refused to admit most of Dr. Goode's proffered testimony.

The jury returned verdicts of guilty of felony murder, armed robbery of Tom Parsons, armed robbery of Edith Parsons, first-degree kidnapping, and felonious breaking and entering.

A sentencing hearing was held pursuant to G.S. 15A-2000 *et seq.*, following the first-degree murder conviction. The evidence

presented by defendant tended to show that he had never been convicted of a serious crime. He was once convicted of "drinking in public" in Virginia. Defendant's employer, Mr. Kennedy, testified that defendant was a hard-working employee and that he had a good reputation. Two friends of defendant and his family from Maryland also testified. The essence of their testimony was that defendant experienced a decided personality change after returning home from Vietnam. He was depressed and troublesome and began drinking. Prior to his time in the service, defendant was a law-abiding citizen. He was described as a very likeable boy with a good reputation. He had also attended church regularly.

Johnny Coffin, who worked with defendant, testified that defendant lived with him for eight months. During this time defendant worked regularly, but drank intoxicants.

Three jailers at the Alleghany County jail also testified. Their testimony tended to show that during his incarceration, defendant was a model prisoner; that while he was in jail awaiting trial, defendant spent a great deal of time praying, reading the Bible and drawing religious pictures.

The State presented no evidence at the sentencing hearing.

The trial court submitted two aggravating circumstances:

1. Was the murder committed for pecuniary gain?

2. Was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against another person?

The trial court submitted the following mitigating circumstances:

1. Does the defendant at the age of 33 years have no significant history of prior criminal activity?

2. Was the murder committed while the defendant was under the influence of mental or emotional disturbance?

3. Was the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law impaired?

4. Did the defendant call the ambulance for assistance of Mr. Parsons while at the Parson residence?

5. Did the defendant submit to arrest without resistance when approached by the police at the Pantry?

6. Did the defendant exhibit good conduct and act as a model prisoner while incarcerated in the county jail?

7. Did the defendant have a low IQ, it being 73?

8. Did the defendant exhibit religious beliefs and practices since being incarcerated in the county jail?

9. Was the defendant exposed to combat, chemicals, and stressful experiences while in Viet Nam?

10. You may consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value.

The jury found beyond a reasonable doubt that both aggravating circumstances existed and that these were sufficiently substantial to call for the imposition of the death sentence. The jury also found that seven of the ten mitigating circumstances (numbers 1, 4, 5, 6, 7, 8, and 9) existed. The jury did not indicate answers to numbers 2, 3, and 10. The jury also found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and recommended that defendant be sentenced to death.

The trial court sentenced defendant to die for the felony murder of Dallas Parsons. Since the underlying felony was armed robbery, the convictions of armed robbery of Tom Parsons and Edith Parsons were arrested.

In the first-degree kidnapping and the felonious breaking and entering convictions, the trial court found as a mitigating factor that defendant had no record of criminal convictions or a record consisting solely of misdemeanors punishable by not more than 60 days imprisonment. The court found as aggravating circumstances that defendant was armed with or used a deadly weapon at the time of each crime; that a lesser sentence would depreciate the seriousness of each crime; that the sentence imposed for each crime was necessary to deter others from committing the same

crime; and that defendant engaged in a pattern of violent conduct which indicated a serious danger to society. The court imposed a sentence of 40 years imprisonment (the maximum allowed) for the first-degree kidnapping and a sentence of 10 years imprisonment (the maximum allowed) for the felonious breaking and entering.

Defendant gave notice of appeal. He appealed his death sentence to this Court pursuant to G.S. 7A-27(a). We allowed his motion to bypass the Court of Appeals pursuant to G.S. 7A-31(a) on the kidnapping and felonious breaking and entering convictions on 23 July 1982.

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Smith, Patterson, Follin, Curtis, James and Harkavy, by Norman B. Smith, Martha E. Johnston, and Donnell Van Noppen, III, for defendant-appellant.*

BRANCH, Chief Justice.

Defendant assigns as error the denial of his pretrial motion for change of venue by Judge Davis and the denial of his motion for change of venue by the trial judge. We find merit in these assignments of error and hold that the denial of these motions requires a new trial.

A motion for a change of venue, or for a venire from another county, is addressed to the sound discretion of the trial court and its ruling thereon will not be disturbed absent a showing of abuse of discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. See*, 301 N.C. 388, 271 S.E. 2d 282 (1980). G.S. 15A-957 provides, in pertinent part:

Motion for change of venue.—If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the judicial district or to another county in an adjoining judicial district, or

(2) Order a special venire under the terms of G.S. 15A-958.

This Court has consistently held that the burden of proving that a fair and impartial trial cannot be received due to pretrial publicity falls on the defendant. *State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982); *State v. Oliver, supra.* In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 2d 600 (1966), the United States Supreme Court held that due process mandates that criminal defendants receive a trial by an impartial jury free from outside influences. The Court also held that where there is a reasonable likelihood that prejudicial pretrial publicity will prevent a fair trial, the trial court should remove the case to another county not so permeated with publicity. In *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976), we adopted this test and held that it applied not only to cases involving pretrial publicity by the media, but also to cases "where the prejudice alleged is attributable to word-of-mouth publicity." *Id.* at 269-70, 229 S.E. 2d at 918.

In support of his motion in instant case, defendant introduced eight newspaper articles which he contends were highly prejudicial and inflammatory. He also presented evidence from Mr. Nelson Harrill, sales manager of WCOK radio station, of radio broadcasts about the murder. These broadcasts were aired numerous times during the weekend following the murder. The contents of these broadcasts were not included in the record. We have reviewed the articles in question and conclude that they were factual, informative, and noninflammatory in nature. Accordingly, these articles do not provide a basis for our holding that the trial court abused its discretion in denying defendant's motion. *See State v. Oliver, supra.*

Had these articles been the extent of defendant's evidence in support of his motion, resolution of this assignment of error would be short and simple. There was, however, additional evidence pertinent to decision of this assignment of error tending to show that Judge Davis erred in denying defendant's pretrial motion.

After Mr. Harrill testified concerning the broadcasts, he was questioned by the court. In response to these questions, Mr. Harrill indicated that his employment took him to various points

throughout Alleghany County.[1] In his opinion, most county residents had heard about and discussed the case. He did not believe defendant could get a fair trial in the county.

Deputy Sheriff Joe Vickerman also testified. He stated:

> In my duties I get a lot of unsolicited information talking to people. They request my views on things, and I have never given my view on the case in question but they give me theirs and I don't attempt to stop them. I've heard it discussed by nearly everyone out in the county who knows I'm a law enforcement officer.

Vickerman stated that he did not believe a jury without prior knowledge of the case could be found. He also stated that he believed "quite a few people" had made up their minds on the ultimate issue in the case.

Woodros Estep, a magistrate, testified that in his capacity as a judicial officer, as well as in other jobs, he had occasions to talk with people throughout the county; that he had heard a lot of discussion about this case from all over the county; and that he did not believe a jury could be found that would be impartial. On cross-examination and recross-examination, he stated that the jury would follow the law and do their duty as jurors. On redirect-examination, he stated that he did not think a jury could be obtained in Alleghany County which would be totally independent and not know anything about the case.

Mr. Edmund Adams, an attorney who was subsequently appointed to serve as co-counsel for defendant but who had no connection with the case at the time of the hearing, testified that he had often heard this case discussed and that people in the community were intensely interested in the case. In his opinion, it was not possible for defendant to get a fair trial in Alleghany County. He also stated that he believed it would be very difficult to get an impartial jury and that the people in the community were mad about the murder of Mr. Parsons. He recalled at least three occasions when people came into his office and said, "I sure do hope they fry this man" (referring to defendant). Adams had

---

1. The 1980 federal census disclosed that Alleghany County contained an area of 225 square miles and a population of 9,587 people. 1981 N.C. Manual, p. 129.

also talked to people who purported to know what the actual facts in the case were. Before he was excused, the trial court asked Mr. Adams:

> Based on the information which you have heard, . . . don't you think the people in this county have a right to be mad?

Adams answered affirmatively.

Mr. Arnold Young, also an Alleghany County attorney, testified that he had heard the case discussed and commented upon by people from all over the county. In his opinion, defendant could not obtain a fair and impartial jury or a fair trial in Alleghany County. The reason for his opinion was that:

> Everyone in the county, or at least a great majority of the people, have heard of the case, and, as Mr. Adams said, they're mad about it.

The Court then engaged in the following dialogue with Mr. Young:

> COURT: I'd like to ask you a question.
>
> You said the people in this county are real mad about somebody committing the crime which was committed, not at this particular individual. Is that correct?
>
> WITNESS: Yes, Sir.
>
> COURT: Don't you think that the people who live in Alleghany County have the unbridled right to try anybody that commits a crime in this county?
>
> WITNESS: Yes, Sir, but I feel that the defendant does have a right to an impartial jury and I don't feel that an impartial jury can be found in Alleghany County in this particular case, Your Honor.

Defendant then indicated that he was prepared to call more witnesses. He stated, however, that their testimony would be merely cumulative.

The trial judge questioned Mr. Murray, an attorney who was appearing with the State in behalf of the Parsons family. Mr. Murray stated that he believed it would be difficult to find a jury

which "had not heard anything about the case and therefore have formed an opinion." Mr. Murray informed the court that he heard people throughout the county talking about this case. He referred to it as a *cause celebre*. He further stated:

> The combination of events, the combination of the person who was killed, the combination of the regard in which the family is held, I think would make it extremely difficult, if not impossible, to get that many people to make a jury. I think if you got a jury you could be assured of a fair jury. I'm just not sure you could ever find enough people who had not heard something about it and therefore formed an opinion.

Thereafter, the court heard arguments from, and engaged in discussions with, attorneys representing the State and defendant. At one point His Honor stated:

> I just don't like to move cases. I think people who live in a county ought to try everybody that commits a crime in that county.

Later on in the discussion, the court said that:

> [T]he citizens of this county are entitled to consideration, too, and they shouldn't have to travel all the way to some other county to see a trial of one of their friends and neighbors being tried.

A review of the motion transcript compels us to conclude that in ruling on the motion, the trial court placed undue and prejudicial emphasis on the right of county residents to try a defendant in the county where a crime was committed, even referring to this right as "unbridled." We agree that county residents have a significant interest in seeing criminals who commit local crimes being brought to justice. For this reason, only in rare cases should a trial be held in a county different from the one in which a crime was allegedly committed.

[1]   The legitimate concern of county residents in trying criminal defendants locally is not, however, the test for determining whether venue should be changed. The test, as stated above, is whether, due to pretrial publicity, there is a reasonable likelihood that the defendant will not receive a fair trial. *Sheppard v. Maxwell, supra; State v. Boykin, supra.* Stated otherwise, a de-

fendant's motion for a change of venue should be granted when he establishes that it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed. *See State v. McDougald*, 38 N.C. App. 244, 248 S.E. 2d 72 (1978), *disc. rev. denied, appeal dismissed*, 296 N.C. 413, 251 S.E. 2d 472 (1979). When such a likelihood is shown to exist, a defendant's right to a fair trial by an impartial jury far outweighs the interest local residents have in trying a defendant in that county.

The evidence presented by defendant prior to jury selection was clearly sufficient to show that there was considerable discussion of this case throughout Alleghany County. Every witness who testified at the hearing on defendant's motion indicated that they believed it would be extremely difficult, if not impossible, to select a jury comprised of individuals who had not heard about the case. The evidence also indicated that due to the publicity surrounding this case, potential jurors were likely to have formed preconceived opinions about defendant's guilt and that defendant would not receive a fair trial by an impartial jury.

This evidence notwithstanding, the State, in effect, contends that the application of recognized principles of law regarding the selection of jurors in a homicide case requires that we find that defendant's motions for change of venue were properly denied.

Our cases indicate that a defendant, in meeting his burden of showing that pretrial publicity precluded him from receiving a fair trial, must show that jurors have prior knowledge concerning the case, that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury. *State v. Dobbins, supra; State v. Harrill*, 289 N.C. 186, 221 S.E. 2d 325, *death sentence vacated*, 428 U.S. 904, 96 S.Ct. 3212, 49 L.Ed. 2d 1211 (1976). In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial. *See State v. Richardson*, 308 N.C. 470, 302 S.E. 2d 799 (1983).

State v. Jerrett

[2] We are of the opinion that the holdings in the cases above referred to are correct and are consistent with the language in *Estes v. Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 1632-33, 14 L.Ed. 2d 543, 550, *reh. denied*, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed. 2d 118 (1965), that "in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused." However, under the particular circumstances of this case, we are not convinced that a showing of identifiable prejudice is required.

In *Sheppard v. Maxwell, supra*, after acknowledging that a defendant must show identifiable prejudice, the Court qualified this acknowledgment with the following language:

Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result *that it is deemed inherently lacking in due process.*

384 U.S. at 352, 86 S.Ct. at 1517, 16 L.Ed. 2d at 614 [quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 85 S.Ct. 1628, 1633, 14 L.Ed. 2d 543, 550 (1965) (emphasis added)]. The Court emphasized that "our system of law has always endeavored to prevent even the probability of unfairness." 384 U.S. at 352, 86 S.Ct. at 1517, 16 L.Ed. 2d at 614 [quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955)].

In *Sheppard*, the Court viewed the totality of the circumstances and concluded that under the facts of that case, there was such a probability that prejudice would result that defendant was denied due process. It is clear that the totality of the circumstances in this case mandate a similar conclusion.

[3] The evidence at the pretrial hearing, standing alone, was sufficient to reveal a reasonable likelihood that defendant could not receive a fair trial in Alleghany County due to the deep-seated prejudice against him.[2] In so concluding, we think it extremely significant to note that here, the crime occurred in a small, rural and closely-knit county where the entire county was, in effect, a neighborhood. This fact distinguishes instant case from *United States v. Haldeman*, 559 F. 2d 31 (D.C. Cir. 1976), *cert. denied*, 431

2. In all fairness to the trial judge, it does not appear that he had before him the evidence that was offered at the pretrial hearing for change of venue.

U.S. 933, 97 S.Ct. 2641, 53 L.Ed. 2d 250, *rehearing denied,* 433 U.S. 916, 97 S.Ct. 2992, 53 L.Ed. 2d 1103 (1977), and others where although the publicity was great, the crimes occurred and the trials were held in large urban areas.

The probability of irreversible prejudice in instant case is further illustrated by the actual jury *voir dire.* The record of the *voir dire* reveals more than the fact that a great number of the potential jurors had some prior knowledge of this case.[3] Approximately one-third of the potential jurors stated that, in some manner, they knew or were familiar with Mr. Parsons or some member of the Parsons family. At least two of the potential jurors summoned were related in some way to the Parsons family. Many of the potential jurors stated that due to the fact that they knew Mr. Parsons or his family they could not give defendant a fair trial or that they would at least be influenced by their relationship with the Parsons. Many of the persons summoned stated that they knew potential State's witnesses. Of this group, some indicated that they would give more weight to the testimony of these witnesses. Some potential jurors indicated that they had already formed an opinion or that they felt they already knew what the facts of the case were. At least one person examined stated that he had visited the Parsons home shortly after the incident and talked with Tom Parsons, a robbery victim. At least one person stated that she was a neighbor of the Parsons.

Of the jury that actually decided the case, as noted above, ten of the twelve and both alternate jurors had heard about the case. Four of the twelve jurors who decided the question of defendant's guilt knew or were at least familiar with the Parsons family or relatives. The foreman of the jury, Mr. Tom Douglas, stated that he heard a relative of Mrs. Parsons emotionally discussing the case. Six members of the twelve-person jury knew or were at least familiar with State's witnesses.

Additionally, we point out that the jury was examined collectively. Prior to jury selection defendant moved that the jury be individually selected pursuant to G.S. 15A-1214(j). The trial judge

3. Many of the potential jurors called were never asked about whether they had been exposed to pretrial publicity because they were excused when they indicated that they could not vote to impose the death penalty under any circumstances or that they could not give defendant a fair trial.

denied this motion. Though the denial of this motion is a separate assignment of error brought forward by defendant, we consider it only in relation to our review of the totality of the circumstances in instant case.

The adverse effect of the denial of defendant's motion is apparent on the facts. Potential jurors and jurors previously selected were seated in the courtroom where they heard many other potential jurors state that they knew the victim, that they knew potential State's witnesses, that they had already formed opinions in the case or that they could not give defendant a fair trial. Potential jurors and jurors previously selected heard the statement by Mr. Douglas that he heard a relative of Mrs. Parsons emotionally discussing the case and were further exposed to a statement by a potential juror that the opinions he heard were "not to [defendant's] benefit." We also note that counsel's inquiry into the extent of the familiarity many jurors had with the case was limited due to the presence in the courtroom of previously selected jurors and potential jurors.

The totality of the circumstances in the case before us clearly reveals that the population of Alleghany County was infected with prejudice against this defendant. Based on the evidence presented at the pretrial hearing and our review of the *voir dire* examination of potential jurors, we conclude that defendant fulfilled his burden of showing that a reasonable likelihood existed that he would not receive a fair trial before an Alleghany County jury.

We therefore hold that the totality of the particular circumstances in this case requires that defendant be awarded a new trial before a jury drawn from a county other than Alleghany.

Notwithstanding the necessity for a new trial, we deem it necessary to discuss certain questions which may arise at the next trial.

## Guilt-Innocence Phase

Defendant argues that the trial court erred in submitting the issue of first-degree kidnapping to the jury. Defendant contends that the indictment charging him with kidnapping was insufficient

to allege kidnapping in the first degree and that the evidence was insufficient to support a conviction of first-degree kidnapping.

[4] We first consider whether the indictment was sufficient to allege first-degree kidnapping.[4]

The established rule is that an indictment will not support a conviction for a crime unless all the elements of the crime are accurately and clearly alleged in the indictment. *State v. Perry,* 291 N.C. 586, 231 S.E. 2d 262 (1977); *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677 (1972). The Legislature may prescribe a form of indictment sufficient to allege an offense even though not all of the elements of a particular crime are required to be alleged. *See, e.g.,* G.S. 15-144.1 (authorizing a short-form indictment for rape) and G.S. 15-144 (authorizing a short-form indictment for homicide). The Legislature has not, however, established a short-form indictment for kidnapping. Accordingly, the general rule governs the sufficiency of the indictment to charge the crime of kidnapping.

The challenged indictment reads as follows:

THE JURORS FOR THE STATE UPON THEIR OATH PRESENT that on or about the 25th day of July, 1981, in Alleghany County Bruce Franklin Jerrett unlawfully and wilfully did feloniously kidnap Edith Parsons, a person who had attained the age of 16 years, by unlawfully removing her from one place to another, without her consent and for the purpose of facilitating the flight of Bruce Franklin Jerrett following his participation in the commission of a felony, Murder.

The North Carolina kidnapping statute, G.S. 14-39, in pertinent part, provides:

---

4. Our review of the record discloses that defendant did not challenge at trial the sufficiency of the indictment to allege first-degree kidnapping. This, however, does not preclude review by this Court. Under G.S. 15A-1446(d)(4), a party may assert as error in this Court that the pleading failed to state essential elements of an alleged violation even though no objection, exception or motion was made at trial. Further, in *State v. Partlow,* 272 N.C. 60, 157 S.E. 2d 688 (1967), we held that "if the offense is not sufficiently charged in the indictment, this Court, *ex mero motu,* will arrest the judgment." *Id.* at 63, 157 S.E. 2d at 691. *See also State v. Fowler,* 266 N.C. 528, 146 S.E. 2d 418 (1966).

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

(1) Holding such other person for ransom or as a hostage or using such other person as a shield; or

(2) Facilitating the commission of any felony or facilitating the flight of any person following the commission of a felony; or

(3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person.

(b) There shall be two degrees of kidnapping as defined by subsection (a). If the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class D felony. If the person kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.

Defendant contends that the language of G.S. 14-39(b) not only creates two degrees of kidnapping, but also creates and establishes the elements of each degree. He maintains that in order to have properly indicted him for first-degree kidnapping, it was necessary for the State, in addition to having alleged the essential elements of kidnapping provided in G.S. 14-39(a), to have alleged at least one of the elements of *first-degree kidnapping* listed in G.S. 14-39(b), to wit, that he did not release Mrs. Parsons in a safe place, that he seriously injured Mrs. Parsons or that he sexually assaulted her. The failure to so allege, he contends, requires the reversal of his conviction for first-degree kidnapping.

Urging this Court to apply the rule of *State v. Williams*, 295 N.C. 655, 249 S.E. 2d 709 (1978) to instant case, the State maintains that the indictment was sufficient to allege first-degree kidnapping.

In *Williams,* this Court was called upon to determine whether the language of then existing G.S. 14-39(b) created essential elements of "aggravated kidnapping." At the time of the *Williams* decision, G.S. 14-39(b) provided:

Any person convicted of kidnapping shall be guilty of a felony and shall be punished by imprisonment for not less than 25 years nor more than life. If the person kidnapped, as defined in subsection (a), was released by the defendant in a safe place and had not been sexually assaulted or seriously injured, the person so convicted shall be punished by imprisonment for not more than 25 years, or by a fine of not more than ten thousand dollars ($10,000), or both, in the discretion of the court.

This Court held that subsection (b) did not create two kidnapping offenses — simple kidnapping and aggravated kidnapping. Subsection (a) was held to create the offense of kidnapping. Subsection (b) was held to relate *only* to matters which could be shown in mitigation of punishment and not to create separate offenses or add any additional elements to the offense of *kidnapping.*

*State v. Williams, supra,* is not dispositive of the questions here presented. By amending G.S. 14-39(b), the Legislature manifested its intent that there would be two degrees of kidnapping. The language of subsection (a) creates and defines the offense of kidnapping. The language of subsection (b) addresses the degree of the crime and dictates that the kidnapping will be first-degree kidnapping if the defendant does not release the victim in a safe place, or if he seriously injures the victim or sexually assaults the victim. The two subsections must be read together to determine the elements of first-degree kidnapping.

We therefore hold that the language of G.S. 14-39(b) states essential elements of the offense of first-degree kidnapping and does not relate to matters in mitigation of punishment. In order for the State to properly indict a defendant for first-degree kidnapping, the State must allege the applicable elements of both subsection (a) and subsection (b). *See State v. Baldwin,* 61 N.C. App. 688, 301 S.E. 2d 725 (1983).

[5] By this assignment of error, defendant also contends that the trial court's instruction on first-degree kidnapping was erroneous.

The particular instruction defendant contends was error is as follows:

> Members of the Jury, if you find that the defendant did not release her, that is let her go *voluntarily* in a safe place and you find those other elements, that would be first degree kidnapping.

> However, if you find that the defendant *voluntarily* turned her loose down at the Pantry, that would reduce it to second degree kidnapping if you find all the other elements that I enumerated.

(Emphasis added.)

Defendant argues that the court's instruction added the element of *voluntary* release to the definition of the offense of kidnapping. We do not agree.

While it is true that G.S. 14-39(b) does not expressly state that defendant must *voluntarily* release the victim in a safe place, we are of the opinion that a requirement of "voluntariness" is inherent in the statute. G.S. 14-39(b) provides that in order for the offense to constitute kidnapping in the second degree, the person kidnapped must be released "in a safe place *by the defendant* . . ." (emphasis added). This implies a conscious, willful action on the part of the defendant to assure that his victim is released in a place of safety.

We further note that defendant's argument is more theoretical than real for it is difficult to envision a situation when a release of the victim *by the defendant* could be other than voluntary. It seems the defendant would either release the victim voluntarily, or the victim would reach a place of safety by effecting an escape or by being rescued.

[6] We now consider whether the evidence was sufficient to sustain defendant's conviction of first-degree kidnapping. Defendant does not dispute the fact that the evidence was sufficient to allow the jury to reasonably find that he kidnapped Mrs. Parsons. Rather, his contention is that the State failed to prove the existence of any of the elements of first-degree kidnapping provided in G.S. 14-39(b).

Here there is no evidence of sexual assault or serious injury to the victim. Therefore, we only decide whether there was sufficient evidence from which the jury could reasonably infer that defendant did not release Mrs. Parsons in a safe place.

In resolving this question, we must be guided by the familiar rule that the evidence must be considered in the light most favorable to the State, giving the State every reasonable inference which may be drawn therefrom. *State v. Williams*, 307 N.C. 452, 298 S.E. 2d 372 (1983). The evidence relevant to the question presented by this assignment of error tends to show that after arriving at "The Pantry," defendant and Mrs. Parsons walked toward the store building. Defendant, carrying a pistol concealed within his shirt, walked a few feet behind Mrs. Parsons. Upon entering the store, Mrs. Parsons walked toward Officer Caudle and then to the rear of the building where she locked herself in a storage room. Defendant did not attempt to stop Mrs. Parsons after they entered the store. Meanwhile, defendant went to the counter and was in the process of purchasing gas when he was confronted and subsequently arrested by Officer Caudle.

Although this evidence presents a close question as to whether defendant released Mrs. Parsons in a safe place, we are of the opinion that it was sufficient to permit the jury to reasonably infer that Mrs. Parsons escaped or that she was rescued by the presence and intervention of the police officer. Conversely, this evidence would have permitted the jury to reasonably infer that defendant released Mrs. Parsons in a safe place. It was for the jury to resolve the conflicting inferences arising from this evidence.

We therefore hold that the evidence was sufficient to carry the case to the jury on the question of first-degree kidnapping.

[7] By his next assignment of error, defendant contends that the trial court should have instructed the jury that even if it did not find that he was legally insane at the time the crimes were committed, it could find that, due to his abnormal mental condition, he did not have the requisite intent to commit armed robbery.

Defendant did not request this instruction and according to Rule 10(b)(2), he thereby waived his right to assign as error the trial judge's failure to give the instruction. Considering the gravi-

ty of the crime charged, however, we elect in our discretion to review this question. *See State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308 (1983).

In essence, defendant maintains that he was entitled to an instruction upon diminished capacity or responsibility. We have consistently held that an instruction on diminished capacity is not required in first-degree murder cases involving specific intent to kill. *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Anderson,* 303 N.C. 185, 278 S.E. 2d 238 (1981); *State v. Shepherd,* 288 N.C. 346, 218 S.E. 2d 176 (1975). We believe it appropriate to apply the same rule to armed robbery since specific intent is also an issue in such cases. We therefore hold that the failure of the trial court to instruct on diminished capacity or responsibility was not error.

[8] Defendant next assigns as error the trial court's refusal to *instruct on the defense of unconsciousness.*

Although the trial judge failed to give the requested instruction, he did instruct the jury as follows:

> Now, Members of the Jury, it would also be your duty to return a verdict of not guilty if you are satisfied from the evidence that the defendant was suffering from blackouts at the time of those alleged offenses and that the defect so impaired his mental capacity that he either did not know the nature or quality of those acts as he was committing them and if he did know, he did not know those acts were wrong, it would be your duty to return a verdict of not guilty.

The rule in this jurisdiction is that where a person commits an act without being conscious thereof, the act is not a criminal act even though it would be a crime if it had been committed by a person who was conscious. *State v. Boone,* 307 N.C. 198, 297 S.E. 2d 585 (1982); *State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975); *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969). The defense, while related to insanity, is different from insanity inasmuch as unconsciousness at the time of the act need not be the result of a mental disease or defect. *State v. Caddell, supra.* Unconsciousness, sometimes referred to as automatism, is a complete defense to a criminal charge. *State v. Mercer, supra.* This is so because "[t]he absence of consciousness not only precludes the

existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability." *Id.* at 116, 165 S.E. 2d at 334 [quoting 1 Wharton's Criminal Law and Procedure (Anderson), § 50, p. 116]. Unconsciousness is an affirmative defense and the burden is on the defendant to prove its existence to the satisfaction of the jury. *State v. Caddell, supra; State v. Williams,* 296 N.C. 693, 252 S.E. 2d 739 (1979).

The State takes the position that the only evidence that defendant suffered from a blackout in the morning hours of 25 July 1981 is his own self-serving and uncorroborated testimony. The State urges us to adopt the rule formulated in *Bratty v. Attorney General for Northern Ireland,* All E.R. 3 (1961) 523, and quoted in *State v. Caddell,* 287 N.C. 266, 288, 215 S.E. 2d 348, 362 (1975), that:

> The evidence of the man himself will rarely be sufficient unless it is supported by medical evidence which points to the cause of the mental incapacity. It is not sufficient for a man to say "I had a black-out:" for "black-out" as Stable, J., said in *Cooper v. McKenna* [1960] Qd. R. at p. 419, "is one of the first refuges of a guilty conscience and a popular excuse." The words of Devlin, J., in *Hill v. Baxter* [1958], 1 All E.R. at p. 197 [1958], 1 Q.B. at 285, should be remembered:
>
> > "I do not doubt that there are genuine cases of automatism and the like, but I do not see how the layman can safely attempt without the help of some medical or scientific evidence to distinguish the genuine from the fraudulent."

In *State v. Mercer, supra,* Justice Bobbitt (later Chief Justice), speaking for the Court, stated:

> Where defendant's evidence, if accepted, discloses facts sufficient in law to constitute a defense to the crime for which he is indicted, the court is required to instruct the jury as to the legal principles applicable thereto. What weight, if any, is to be given such evidence, is for determination by the jury.

275 N.C. at 116, 165 S.E. 2d at 334. *See also State v. Lawrence,* 262 N.C. 162, 136 S.E. 2d 595 (1964).

We are cognizant of the fact that in *State v. Caddell, supra,* this Court, relying on *Bratty, questioned* whether the uncor-

State v. Jerrett

roborated and unexplained testimony of a defendant that he was unconscious at the time the alleged crime was committed was sufficient to require an instruction on the defense of unconsciousness. We need not determine, however, whether *Mercer* was correctly decided because here there was corroborating evidence tending to support the defense of unconsciousness. In addition to the testimonial corroborating evidence, defendant's very peculiar actions in permitting the kidnapped victim to repeatedly ignore his commands and finally lead him docilely into the presence and custody of a police officer lends credence to his defense of unconsciousness.

We therefore hold that the trial judge should have instructed the jury on the defense of unconsciousness. The instruction given by Judge Rousseau referring to defendant's blackouts amounted only to a partial instruction on the defense of insanity and did not explain the law of unconsciousness or apply that law to the facts of the case.[5]

Defendant's argument that the trial judge prejudicially misstated his contentions in instructing the jury does not warrant discussion. At trial, defendant did not object to the instruction he now maintains was erroneous. At the new trial, defendant should adhere to the dictates of Appellate Rule 10(b)(2) and our case law to insure that his contentions are fully and correctly stated. *See State v. Silhan,* 302 N.C. 223, 275 S.E. 2d 450 (1981).

[9] Defendant next takes the position that it was error to exclude for cause fourteen jurors who unequivocally stated their opposition to the death penalty. The thrust of defendant's argument is that prior to *voir dire* examination of prospective jurors, the trial court must explain in detail the procedural and substantive aspects of the sentencing process.

Defendant acknowledges that a similar argument was addressed to this Court, but not discussed, in *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), *reh. denied,* --- U.S. ---, 103 S.Ct. 839, 74 L.Ed. 2d 1031 (1983). He requests that we reconsider the

5. For guidance on the instruction of unconsciousness, *see* Pattern Jury Instructions, N.C.P.I.-Crim.-302.10; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969); *State v. Boone,* 307 N.C. 198, 297 S.E. 2d 585 (1982).

"implicit" rejection of this argument in *Pinch* and vacate his death sentence.

Defendant cites no authority on point and we find his reasoning unpersuasive. This assignment of error is without merit.

### Sentencing Phase (Murder)

Our holding that defendant is entitled to a new trial also entitles him to a new sentencing hearing if convicted of first-degree murder. *State v. Jones,* 296 N.C. 495, 251 S.E. 2d 425 (1979). Even so, there are several issues raised by defendant relating to sentencing which we deem necessary to discuss.

We first consider defendant's broadside assault on the constitutionality of G.S. 15A-2000 *et seq.*, the North Carolina death penalty statute. We find these arguments to be meritless and discuss them only briefly.

[10] Defendant contends that the death penalty statute violates his constitutional right to privacy, a right recognized by the United States Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147, *reh. denied,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed. 2d 694 (1973).

Defendant has failed to cite a decision by any court holding or even suggesting that the imposition of a death sentence violates a defendant's right to privacy. We find defendant's argument to be without merit.

[11] Defendant also argues that the North Carolina death penalty scheme is unconstitutional because of our holding in *State v. Harris,* 290 N.C. 718, 228 S.E. 2d 424 (1976). In *Harris,* we held that when a defendant is tried for first-degree murder on the theory of premeditation and deliberation, the trial judge *must* submit to the jury the offense of second-degree murder, even though the evidence does not support this offense. It is his position that the holding in *Harris* permits the jury to capriciously, arbitrarily, and subjectively decide which defendants charged with first-degree murder will live and which will die. The *Harris* rule, which was in effect when defendant was tried, was overruled by this Court in *State v. Strickland,* 307 N.C. 274, 298 S.E. 2d 645 (1983).

In instant case, defendant was convicted of felony murder and found not guilty of murder based upon premeditation and

deliberation. A person convicted of felony murder is guilty of murder in the first degree, irrespective of premeditation and deliberation or malice aforethought. *State v. Hairston*, 280 N.C. 220, 185 S.E. 2d 633, *cert. denied, sub nom., McIntyre v. North Carolina*, 409 U.S. 888, 93 S.Ct. 194, 34 L.Ed. 2d 145 (1972).

In all probability, defendant will be tried on the theory of felony murder at the new trial. If so, *Harris* has no application. Even if the State should elect to try defendant on the theory of premeditation and deliberation, *Harris* would have no application in light of our ruling in *State v. Strickland, supra.*[6]

We now consider defendant's contention that in the course of his closing argument, the prosecutor made improper disparaging characterizations of him which were not supported by the evidence and which were calculated to prejudice the jury.

[12] We do not consider it necessary to discuss defendant's contention at length since such an argument may not be made at the new trial. Suffice it to say that we find no evidence in this record to support the prosecutor's characterizations of defendant as a "conman" and a "disciple of Satan." *See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979).

Defendant contends that the judge erred in submitting the following aggravating circumstances to the jury:

1. Was the murder committed for pecuniary gain? G.S. 15A-2000(e)(6).

2. Was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against another person? G.S. 15A-2000(e)(11).

---

6. Query—Is the State precluded from prosecuting on the theory of premeditation and deliberation on retrial of this case? This question has not been briefed or argued and is therefore not properly before us. We find no North Carolina authority on this point. However, for discussion of this issue, *see generally, Jackson v. Follette*, 462 F. 2d 1041 (2d Cir.), *cert. denied*, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed. 2d 496 (1972); *People v. Jackson*, 20 N.Y. 2d 440, 231 N.E. 2d 722 (1967), *cert. denied*, 391 U.S. 928, 88 S.Ct. 1815, 20 L.Ed. 2d 668 (1968); *People v. Bloeth*, 16 N.Y. 2d 505, 208 N.E. 2d 177 (1965), *cert. denied*, 384 U.S. 1007, 86 S.Ct. 1940, 16 L.Ed. 2d 1020 (1966).

These were the only aggravating circumstances submitted to the jury, and the jury found both to exist. Defendant argues that there was insufficient evidence to support either aggravating circumstance and therefore his death sentence should be vacated.

We first consider whether the aggravating circumstance set forth in G.S. 15A-2000(e)(6) was properly submitted.

It is now well established that when a defendant is convicted of felony murder in which the underlying felony was robbery, the court may submit the aggravating circumstance that the murder was committed for pecuniary gain if the circumstance is supported by the evidence. *State v. Oliver, supra; State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Irwin,* 304 N.C. 93, 282 S.E. 2d 439 (1981).

[13]  We therefore must determine whether there was sufficient evidence to support the submission of this aggravating circumstance.

The evidence tends to show that defendant robbed Tom Parsons of three dollars, took cartridges from the dwelling, took money from the murder victim's pockets and then stole the Parsons' automobile. Thus, there was plenary evidence to support a finding that the murder was committed for pecuniary gain.

[14]  We likewise find that there was ample evidence to support the submission of the aggravating circumstance that the murder of Dallas Parsons was part of a course of conduct in which defendant engaged, and the course of conduct included the commission by defendant of other crimes of violence against another person. G.S. 15A-2000(e)(11). Although defendant does not challenge the sufficiency of the evidence to support the charge that he kidnapped Mrs. Parsons, he argues that this was not a crime of violence. We disagree.

The evidence clearly shows that after defendant shot Dallas Parsons he pointed the gun at Mrs. Parsons and forced her to come to him. He then dragged her about the house and then to the Parsons' automobile. During this time and during the drive to Sparta, he continued to threaten Mrs. Parsons verbally and by pointing the pistol at her.

We therefore hold that the trial judge properly submitted the aggravating circumstances set forth in G.S. 15A-2000(e)(6) and G.S. 15A-2000(e)(11).

[15] We next consider defendant's contention that the trial court erred by instructing the jury that it must return a verdict of death if it found that the aggravating circumstances outweighed the mitigating circumstances, thereby lowering the State's burden of proof. The trial court instructed, in part, as follows:

> So I charge that for you to recommend that the defendant be sentenced to death, the State must prove three things beyond a reasonable doubt. A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies you or entirely convinces you of each of the following things:
>
> First, that one or more statutory aggravating circumstances existed;
>
> Second, that the aggravating circumstance or circumstances found by you are sufficiently substantial to call for the imposition of the death penalty;
>
> And third, that the aggravating circumstance or circumstances found by you outweigh any mitigating circumstance or circumstances found by you.
>
> [If you unanimously find all three of these things beyond a reasonable doubt, it would be your duty to recommend that defendant be sentenced to death. If you do not so find, or if you have a reasonable doubt to one or more of these things, it would be your duty to recommend that the defendant be sentenced to life imprisonment.]
>
> EXCEPTION NO. 37

Defendant argues that the trial court should have also instructed the jury that before they could recommend a death sentence, they would have to determine that the aggravating circumstances outweighed the mitigating circumstances so substantially as to justify the death penalty beyond a reasonable doubt.

In *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308 (1983), *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983), and *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983), we held that instructions substantially similar to that given in instant case were free from prejudicial error, but were not model instructions. The instruction approved by this Court in *McDougall* is one which includes an instruction to the jury that they must find the aggravating circumstance or circumstances sufficiently substantial to call for the imposition of death when considered with the mitigating circumstance or circumstances before the death penalty may be imposed. If, on retrial, defendant is convicted of first-degree murder, the trial court should instruct the jury at the sentencing hearing in accordance with the instruction approved in *State v. McDougall, supra.*

## Sentencing (kidnapping and felonious breaking and entering)

Defendant assigns as error the trial court's imposition of maximum sentences on the kidnapping and felonious breaking and entering charges.

In sentencing defendant for kidnapping and felonious breaking and entering, the trial judge imposed the maximum sentence allowed for each offense under the Fair Sentencing Act. He did so after finding that the aggravating factors in each case outweighed the mitigating factors. The trial judge found the same aggravating and mitigating factors in each case. The aggravating factors found were:

1. The defendant was armed with or used a deadly weapon at the time of the crime.

2. Lesser sentence would depreciate the seriousness of the crime.

3. This sentence is necessary to deter others from committing the same crime.

4. The defendant engaged in a pattern of violent conduct which indicated a serious danger to society.

The first aggravating factor was found to exist pursuant to G.S. 15A-1340.4(a)(1)i which states that "the defendant was armed with or used a deadly weapon at the time of the crime."

The remaining three aggravating factors were found to exist pursuant to the language of G.S. 15A-1340.4(a) which, in pertinent part, provides:

In imposing a prison term, the judge, under the procedures provided in G.S. 15A-1334(b), may consider any aggravating and mitigating factors that he finds are proved by the preponderance of the evidence, and that are reasonably related to the purposes of sentencing, *whether or not such aggravating or mitigating factors are set forth herein,* . . .

(emphasis added).

Clearly, the trial judge properly found the aggravating factor provided for in G.S. 1340.4(a)(1)i since all of the evidence shows that defendant was armed with a deadly weapon.

[16]   The aggravating factor that defendant engaged in a pattern of violent conduct which indicated a serious danger to society was also correctly found. In *State v. Ahearn,* 307 N.C. 584, 300 S.E. 2d 689 (1983), we held that a defendant's dangerousness to others was reasonably related to "the purposes of sentencing one of which is 'to protect the public by restraining offenders.' G.S. § 15A-1340.3." *Id.* at 604, 300 S.E. 2d at 702, and could be considered as a factor in aggravation. *Accord State v. Chatman,* 308 N.C. 169, 301 S.E. 2d 71 (1983).

In instant case, the bizarre manner in which defendant perpetrated the crimes of murder and kidnapping was sufficient to support this finding. Further, his own testimony that he committed acts of violence upon his sister while "blacked-out" would support a finding that defendant engaged in a pattern of conduct which indicated a serious danger to society.

[17]   The second and third aggravating factors, however, are contrary to this Court's recent decision in *State v. Chatman, supra.* In *Chatman,* as in instant case, the trial judge found as aggravating factors that the sentence imposed was necessary to deter others, and that a lesser sentence would unduly depreciate the seriousness of the crime. We held that the consideration of these factors in aggravation was error. Justice Meyer, writing for the Court, stated:

These two factors fall within the exclusive realm of the legislature and were presumably considered in determining

the presumptive sentence for this offense. While both factors serve as legitimate purposes for imposing an active sentence, neither may form the basis for increasing or decreasing a presumptive term because neither relates to *the character or conduct of the offender. See State v. Ahearn,* [307 N.C. 584, 300 S.E. 2d 689 (1983) ].

*Id.* at 180, 301 S.E. 2d at 78.

We therefore hold that the trial judge erred in finding the second and third aggravating factors in the kidnapping and felonious breaking and entering cases.

We do not discuss defendant's remaining assignments of error, all of which concern questions which have been heretofore decided by this Court or questions which in all probability will not recur at defendant's next trial. For the reasons stated, there must be a new trial in both the guilt-innocence phase and the sentencing phase.

New trial.

Justice MITCHELL dissenting in part and concurring in part.

I cannot agree with either the majority's conclusion that the "defendant fulfilled his burden of showing that a reasonable likelihood existed that he would not receive a fair trial before an Alleghany County jury" or with the majority's holding that the defendant must receive a new trial on this basis. As to these points, I must respectfully dissent. Otherwise, I concur in the opinion of the majority.

The majority appears to base its holding in this regard, at least in part, upon the Constitution of the United States, as it relies heavily upon cases decided by the Supreme Court of the United States on constitutional grounds. Particularly for this reason, I fear that the precedent established by the majority in this case inevitably creates the "potential for needless friction between the rights of a free press guaranteed by the First Amendment to the Constitution of the United States and the defendant's right to trial by an impartial jury guaranteed by the Sixth Amendment." *State v. McDougald,* 38 N.C. App. 244, 249, 248 S.E. 2d 72, 78 (1978), *discretionary review denied, appeal*

*dismissed,* 296 N.C. 413, 251 S.E. 2d 472 (1979). By its opinion to-
day, I believe the majority tends to destroy the delicate balance
between the First Amendment and the Sixth Amendment and to
give the Sixth Amendment clear priority status over the First
Amendment.

Certainly there was no error in denying the defendant's
*pretrial* motion for a change of venue or special venire from
another county. I have found only one case, *Rideau v. Louisiana,*
373 U.S. 723 (1963), in which the Supreme Court of the United
States determined that, no matter what could be shown during
the selection of the jury, the community in which the defendant
was tried must be presumed to be so prejudiced as a result of
pretrial publicity that the defendant could not receive a fair trial.
That case is unique, however, in that it involved a factual situa-
tion in which the defendant's pretrial showing revealed that his
televised confession without benefit of counsel was participated in
by law enforcement authorities and was shown repeatedly to the
local viewing audience in the small community from which the
jury was drawn. I believe that case is "an aberration which
should be confined to its facts and not brought into play here."
*State v. McDougald,* 38 N.C. App. at 249, 248 S.E. 2d at 78 (1978).
Even in *Rideau* Justices Clark and Harland dissented on the
ground that there was no showing that the jury which actually
heard the case had been affected by the publicity.

To the extent the majority relies upon *Sheppard v. Maxwell,*
384 U.S. 333 (1966) and *Estes v. Texas,* 381 U.S. 532 (1965) as sup-
port for its holding that the trial court erred in failing to allow a
change of venue or special venire, I believe the majority's
reliance is misplaced. In each of those cases, the Supreme Court
of the United States discussed the heavy pretrial publicity in-
volved but emphasized the trial court's failure to take measures
to insulate the jury from massive publicity *during the trial* and
disruptive conduct of reporters and others *during the trial.*
*United States v. Haldeman,* 559 F. 2d 31, 61 n. 32 (D.C. Cir. 1976),
*certiorari denied,* 431 U.S. 933, *rehearing denied,* 433 U.S. 916
(1977). No such failure by the trial court is before us in the pres-
ent case, and neither *Sheppard* nor *Estes* is controlling authority
given the facts of this case.

I can conceive of almost no circumstance in which an ap-
pellate court should reverse a trial court for its refusal to grant a

change of venue or special venire prior to the *voir dire* during which the jury is selected. In my view, "If an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial." *United States v. Haldeman*, 559 F. 2d at 63.

Further, I do not think that anything in the record before us in the present case indicates that the defendant bore his burden under either the totality of the circumstances test or the actual prejudice test of showing a reasonable likelihood that he would not receive a fair trial before an Alleghany County jury. As the majority points out, the defendant sought to support his pretrial motion by introducing the testimony of several attorneys, a magistrate and a deputy sheriff in which each gave his opinion that the defendant could not receive a fair trial in Alleghany County. Assuming *arguendo* that a sufficient groundwork had been laid to make such opinion testimony admissible, it was insufficient to show a reasonable likelihood that the defendant could not receive a fair trial in Alleghany County.

In *United States v. Haldeman*, 559 F. 2d 31 (D.C. Cir 1976), *certiorari denied*, 431 U.S. 933, *rehearing denied*, 433 U.S. 916 (1977), a former Attorney General of the United States and the two highest advisors to President Nixon were on trial for their participation in the Watergate affair. This scandal and the defendants' participation therein received massive daily publicity for more than twenty-two months. The crimes for which the defendants were on trial received in all probability the most extensive news media coverage in the history of the United States. Clearly admissible scientific sampling revealed that sixty-one percent of the population of the District of Columbia thought the defendants were in fact guilty and that this percentage was significantly higher than the corresponding national average. *Id.*, 559 F. 2d at 144, MacKinnon, Circuit Judge, concurring in part and dissenting in part. Newspaper coverage alone in the District of Columbia consumed an average of thirty to one hundred twenty column inches a day for a total of more than fifty thousand column inches during the entire twenty-two month period between the disclosure of the Watergate break-in and the defendants' motion for a change of venue. Nevertheless, the United States Court of Appeals for the District of Columbia Circuit held that:

In short, unlike the situation faced by the Court in *Rideau,* we find in the publicity here no reason for concluding that the population of Washington, D. C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury.

559 F. 2d 31 at 61-2. The effect of the pretrial publicity in the present case, whether by word of mouth or through the news media, was insignificant by comparison to that shown by competent evidence to exist in *Haldeman.* The opinion testimony of the defendant's witnesses concerning their perception as to whether he could receive a fair trial in Alleghany County was not such as to require the trial court to allow the defendant's motion for change of venue or for a special venire.

Similarly, nothing occurring during the *voir dire* at which the twelve jurors who convicted the defendant were selected revealed a reasonable likelihood that he would not receive a fair trial. It is true, of course, that:

In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Murphy v. Florida,* 421 U.S. 794, 803 (1975). During the selection of the twelve jurors who served in the present case, the defendant challenged four veniremen for cause when they indicated that they would have difficulty in disabusing themselves of any preconceived opinions they may have formed as a result of pretrial publicity. The trial court on its own motion excused twelve veniremen for this reason. Thus, a total of sixteen veniremen were excused because they indicated that they had formed or might have formed opinions as a result of their familiarity with the parties or pretrial publicity. No juror who participated in the determination of the defendant's guilt indicated that he or she had formed any opinion as to the defendant's guilt prior to hearing evidence. Each stated affirmatively

that he or she could base a decision as to the defendant's guilt solely upon the evidence introduced at trial and uninfluenced by any other factors.

Therefore, the present case is not controlled by *Irvin v. Dowd*, 366 U.S. 717 (1961). In *Irvin* sensational publicity adverse to the accused permeated the small town in which the trial was held. The *voir dire* examination indicated that ninety percent of the veniremen and eight of the twelve jurors who actually determined the defendant's guilt had a preconceived opinion as to the defendant's guilt, and the defendant unsuccessfully challenged for this cause several people who sat on the jury. The trial court had excused for this cause 268 of the 430 veniremen. No such situation is presented by the present case.

In my view, this case is controlled, instead, by *Murphy v. Florida*. There, Mr. Justice Marshall speaking for the Court distinguished *Irvin v. Dowd* and stated that:

> In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to the petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

421 U.S. at 803. Here, as in *Murphy*, the jurors *who participated in the trial* "displayed no animus of their own." The exclusion of 16 veniremen for preconceived opinions, like the exclusion of 20 veniremen for the same reason in *Murphy*, "by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own." *Id.* Therefore, the defendant failed to carry his burden.

I respectfully suggest that the majority has lost sight of the fact that jurors need not be totally ignorant of the facts and issues involved in the case to be tried and are not required to come to their duties without having formed any impressions or opinions concerning the case. As the Supreme Court of the United States has clearly stated:

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective jurors's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. at 723. Here, the defendant entirely failed to carry his burden of showing that any juror who passed upon his guilt was unable to lay aside any impression or opinion and render a verdict based on the evidence presented in court. Each of the jurors affirmatively stated that he or she could lay aside any such impressions or opinions and, as previously pointed out, the defendant offered nothing sufficient to impeach the jurors' indications of indifference and lack of animus.

Additionally, the majority has correctly stated that, in order to meet the burden of showing that pretrial publicity precluded a fair trial, a defendant must show "that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury." In my view, no such showing was made in the present case.

When the jury of twelve had been selected, the defendant had not exhausted his peremptory challenges. Although one juror, Mrs. Maxwell, was challenged for cause when she indicated that she did not believe in the insanity defense but could apply it if the trial court instructed her on the law, no juror was seated over the defendant's objection who indicated that he or she had formed or might have formed an opinion concerning the case to be tried. The fact that the defendant later exhausted his peremptory challenges during the selection of two alternate jurors is irrelevant since neither of the alternates sat on the jury which determined the defendant's guilt.

No juror who passed upon the defendant's guilt was challenged for cause by the defendant for having formed an opinion concerning the case to be tried. "The fact that [the defendant] did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." *Beck v. Washington,* 369 U.S. 541, 558 (1962). The defendant's failure to show that he

exhausted his peremptory challenges during selection of the jury which tried him is fatal to his assignment of error.

For the foregoing reasons I dissent in part from the opinion of the majority and vote to find no error in the guilt-innocence determination phase of the defendant's trial. As the opinion of the majority makes it unnecessary for this Court to reach its statutory duty of proportionality review, I express no opinion as to the appropriateness of the sentence of death.